**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

v.

ALI SADR HASHEMI NEJAD,

*Defendant*.

Case No. 18 Cr. 224 (AJN)

ORAL ARGUMENT REQUESTED

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT ALI SADR HASHEMI NEJAD'S MOTION *IN LIMINE* TO EXCLUDE**
**EXPERT TESTIMONY**

Reid H. Weingarten
STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, New York 10036
Tel: (212) 506-3900
Fax: (212) 506-3950
rweingarten@steptoe.com

Brian M. Heberlig (Pro Hac Vice)
Bruce C. Bishop (Pro Hac Vice)
David M. Fragale
Nicholas P. Silverman (Pro Hac Vice)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, DC 20036
Tel: (202) 429-3000
Fax: (202) 429-3902
bheberlig@steptoe.com

*Counsel for Defendant*
*Ali Sadr Hashemi Nejad*

Dated: January 10, 2020

# TABLE OF CONTENTS

I.      The Court Should Exclude the Late- and Inadequately-Noticed Expert Testimony For Violation of the Discovery Order and Rule 16 ................................................................ 3

     A.      Legal Standard ................................................................................................ 3

     B.      The Government's Last-Minute, Bare-Bones Expert Notice Is Woefully Insufficient ................................................................................................. 3

         1.      The eleventh-hour notice violated the discovery order ............................. 3

         2.      The government's disclosures are insufficient under Rule 16 .................. 8

II.      The Court Should Exclude Testimony About the Iranian Government's Support for Terrorism, Nuclear Proliferation, Hostage-Taking, "Economic Jihad," and the Like Because Its Extreme Unfair Prejudice Outweighs Its Minimal Probative Value ................................................................................................................ 11

III.      The Court Should Not Allow the Proposed Experts to Testify to Hearsay or Otherwise Inadmissible Testimony .......................................................................... 16

     A.      Expert Testimony Cannot Be Used as a Vehicle for Inadmissible Hearsay ......... 17

     B.      The Proposed Experts Should Be Prohibited from Propounding the Impermissible Theory that Sadr's Guilt Can Be Inferred from the Behavior of Unrelated Persons ................................................................................. 19

IV.      Any Proposed Expert Testimony Should Be Subject to *Daubert* .................................... 22

     A.      Legal Standard ................................................................................................ 22

     B.      The Court Should Exclude the Proposed Expert Testimony of Mark Dubowitz ................................................................................................. 23

         1.      Mr. Dubowitz is not qualified as an expert on the "history of sanctions evasion practices in Iran" .......................................................................... 24

         2.      Mr. Dubowitz is not qualified as an expert on five of the six subtopics in the government's notice .......................................................................... 26

         3.      Mr. Dubowitz's proposed testimony would not help the jury ................. 27

         4.      The government has not carried its burden to prove that Mr. Dubowitz's opinions are (i) supported by sufficient facts or data and (ii) the product or reliable principles and methods ............................................................ 28

C.     The Court Should Limit the Proposed Testimony From an OFAC Witness to Non-Expert Testimony Regarding the Existence or Non-Existence of Specific Licenses .................................................................................... 30

     1.     Qualifications in the proposed areas of expert testimony ......................... 30

     2.     The proposed expert testimony of an OFAC expert would not help the jury ........................................................................................................ 30

     3.     The government has not carried its burden to prove that its proposed OFAC expert's opinions are (i) supported by sufficient facts or data and (ii) the product of reliable principles and methods ................................... 37

D.     The Court Should Exclude Expert Testimony From Bank Representatives, Allowing Only Percipient Fact Testimony Regarding the Practices of the Banks At Issue .................................................................................... 37

     1.     Qualifications in the proposed areas of expert testimony ......................... 37

     2.     The proposed expert testimony of a bank industry expert would not help the jury ................................................................................................... 38

     3.     The government has not carried its burden to prove that the proposed banking industry witness's opinions are (i) supported by sufficient facts or data and (ii) the product of reliable principles and methods ............... 39

**<u>TABLE OF AUTHORITIES</u>**

**Cases**                                                                          **Page(s)**

*24/7 Records v. Sony Music Entertainment*
    514 F. Supp. 2d 571 (S.D.N.Y. 2007).......................................................................26

*Arista Records v. Lime Group*,
    No. 06-cv-5936, 2011 WL 1674796 (S.D.N.Y. May 2, 2011) ..............................22

*Baker v. Urban Outfitters*,
    254 F. Supp. 2d 346 (S.D.N.Y. 2003).......................................................................21

*Berk v. St. Vincent's Hosp. & Med. Ctr.*,
    380 F. Supp. 2d 334 (S.D.N.Y. 2005).......................................................................27

*Daniels v. City of New of York*,
    No. 16-cv-9080 (AJN), 2018 WL 5919307 (S.D.N.Y. Nov. 13, 2018)............8, 23

*Daubert v. Merrell Dow Pharm.*
    509 U.S. 579 (1993).........................................................................................1, 21, 22

*DiBella v. Hopkins*,
    403 F.3d 102 (2d Cir. 2005)......................................................................................18

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997)..................................................................................................22

*Hernandez v. Leichliter*,
    No. 14-cv-5500 (AJN), 2016 WL 684038 (S.D.N.Y. Feb. 18, 2016) ....................26

*Highland Capital Mgm't v. Schneider*,
    379 F. Supp. 2d 461 (S.D.N.Y. 2005).........................................................25, 27, 29

*Hygh v. Jacobs*,
    961 F.2d 359 (2d Cir. 1992)......................................................................................28

*In re LIBOR-Based Fin. Instrs. Antitrust Litig.*,
    299 F. Supp. 3d 430 (S.D.N.Y. 2018).......................................................................20

*In re Mirena IUD Prods. Litig.*,
    169 F. Supp. 3d 396 (S.D.N.Y. 2016).......................................................................16

*In re Pfizer Sec. Litig.*,
    819 F.3d 642 (2d Cir. 2016)................................................................................21, 26

*In re Rezulin Prods. Liab. Litig.*,
   309 F. Supp. 2d 531 (S.D.N.Y. 2004) ................................................................. 16

*Marx & Co. v. Diners' Club*,
   550 F.2d 505 (2d Cir. 1977) ................................................................................ 28

*Nimely v. City of New York*,
   414 F.3d 381 (2d Cir. 2005) ............................................................................... 27

*On Track Innovations Ltd. v. T-Mobile USA*,
   106 F. Supp. 3d 369 (S.D.N.Y. 2015) ................................................................... 8

*SEC v. Tourre*,
   950 F. Supp. 2d 666 (S.D.N.Y. 2013) ................................................... 22, 23, 24

*United States v. Al-Moayad*,
   545 F.3d 139 (2d Cir.2008) ........................................................................... 10, 32

*United States v. Amuso*,
   21 F.3d 1251 (2d Cir. 1994) ............................................................................... 20

*United States v. Banki*,
   No. 10-cr-08, 2010 WL 1875690 (S.D.N.Y. May 10, 2010) .............................. 29

*United States v. Banki*,
   685 F.3d 99, 109 (2d Cir. 2012) ......................................................................... 32

*United States v. Banks*,
   761 F.3d 1163 (10th Cir. 2014) ............................................................................ 6

*United States v. Campagnuolo*,
   592 F.2d 852 (5th Cir. 1979) ................................................................................ 5

*United States v. Castillo*,
   924 F.2d 1227 (2d Cir. 1991) ............................................................ 15, 18, 19, 20

*United States v. Chalhoub*,
   No. 16-cr-23, 2018 WL 1477465 (E.D. Ky. Mar. 25, 2018) ................................ 6

*United States v. Cruz*,
   981 F.2d 659 (2d Cir. 1992) ............................................................................... 19

*United States v. Dukagjini*,
   326 F.3d 45 (2d Cir. 2003) ................................................................... 22, 33, 35

*United States v. Holmes*,
   670 F.3d 586 (4th Cir. 2012) ............................................................................... 8

v

*United States v. Long,*
917 F.2d 691 (2d Cir. 1990)................................................................19, 20

*United States v. McElroy,*
697 F.2d 459 (2d Cir. 1982)......................................................................4

*United States v. Mejia,*
545 F.3d 179 (2d. Cir. 2008)..................................................16, 19, 20, 33

*United States v. Mulder,*
273 F.3d 91 (2d Cir. 2001)......................................................................19

*United States v. Nichols,*
169 F.3d 1255 (10th Cir. 1999) ................................................................5

*United States v. Ornelas,*
906 F.3d 1138 (9th Cir. 2018) ..................................................................5

*United States v. Romano,*
794 F.3d 317 (2d Cir. 2015) ...................................................................26

*United States v. Scop,*
846 F.2d 135 (2d Cir. 1988)....................................................................18

*United States v. Sims,*
776 F.3d 583 (8th Cir. 2015) ....................................................................6

*United States v. Tin Yat Chin,*
371 F.3d 31 (2d Cir. 2004)......................................................................22

*United States v. Ulbricht,*
858 F.3d 71 (2d Cir. 2017)............................................................. *passim*

*United States v. W.R. Grace,*
526 F.3d 499 (9th Cir. 2008) (en banc) ....................................................5

*United States v. Wicker,*
848 F.2d 1059 (10th Cir. 1988) ................................................................5

*United States v. Zodhiates,*
901 F.3d 137 (2d Cir. 2018)......................................................................2

# INTRODUCTION

A year and a half after the Rule 16 discovery deadline passed and it represented its Rule 16 disclosures were complete, and a mere eight days before the motion in limine deadline, the government copied and served its expert notice from *United States v. Atilla*, along with transcripts of its expert testimony in that case, as its purported expert disclosures for trial here. *Atilla* was a dramatically different case, that should not serve as any precedential roadmap, much less a ticket to admit the same expert testimony.

"Not only were the disclosures late, more importantly, they were plainly inadequate." *United States v. Ulrich*, 858 F.3d 71, 115 (2d Cir. 2017). The government's disclosure does not identify any facts, data, principles, or methods supporting the proposed expert testimony. It does not identify or summarize any opinions to be offered, or any bases or support for any opinions. For two proposed experts—an OFAC expert, and a banking expert—the disclosure does not even identify the proposed witnesses or their qualifications. For the witness who is identified (think tank CEO Mark Dubowitz), the government does not identify any evidence to show Mr. Dubowitz has specialized knowledge, training, or experience to qualify him as an expert on the subject area for which he is offered (the "history of sanctions evasion practices in Iran"), or on five of the six topics under that heading for which the government proposes that he testify. Nearly all of the proffered expert testimony is insufficient to pass muster under *Daubert*. The government's late and slapdash effort to notice expert testimony for this trial should be rejected.

Finally, the transcripts of testimony from the *Atilla* trial furnished by the government show two especially objectionable aspects of the government's proposed testimony. *First*, the government seeks to have its witnesses, especially Mr. Dubowitz, testify extensively about Iran's responsibility for state-sponsored terrorism, terror attacks against Americans, nuclear proliferation, "economic jihad," and similar inflammatory topics. Those subjects, arguably

relevant in Atilla's trial that involved laundering of billions of dollars of oil revenue for the Government of Iran and blocked SDN companies, where one defendant wrote to the Iranian government to expressly pledge allegiance to "economic jihad," have no place in this vastly different trial involving payments for a lawful commercial project by a private company in a third country. Especially in light of recent events, testimony about state-sponsored terror attacks and similar inflammatory subjects in this case would be so overwhelmingly and unfairly prejudicial that Sadr could not receive a fair trial.

*Second*, the government seeks to have its OFAC witness walk through the sanctions regulations charged in this case and tell the jury what is prohibited and illegal under each one, and the factual circumstances that would bring transactions or conduct within those prohibitions. Such testimony would usurp this Court's role in instructing the jury on the applicable law.

Defendant Ali Sadr Hashemi Nejad respectfully moves *in limine*:

(1) to exclude the government's proposed expert testimony because the government's late and incomplete notice violates the Discovery Order and Rule 16;

(2) to exclude proposed testimony about the Government of Iran's support for terrorism, nuclear proliferation, hostage-taking, declaration of economic jihad and similarly inflammatory and unfairly prejudicial topics;

(3) to prohibit the proposed use of experts as a vehicle for inadmissible hearsay; and

(4) to exclude any remaining proposed testimony because expert testimony on those topics would be unhelpful or unreliable and cannot pass muster under *Daubert*. At a minimum, the government's proposed experts must pass scrutiny at a *Daubert* hearing.

**ARGUMENT**

**I.      The Court Should Exclude the Late- and Inadequately-Noticed Expert Testimony For Violation of the Discovery Order and Rule 16**

**A.      Legal Standard**

Under Rule 16(a)(1)(G), the government must give the defendant, upon request, "a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief."  Those rules govern expert testimony (Rule 702), the bases of any expert's opinion (Rule 703), and the facts or data underlying any such opinion (Rule 705).  The written summary "must" describe any opinions the witness will offer, as well as "the bases and reasons for those opinions."  *Id.*  Failing to comply with Rule 16 may result in exclusion of the undisclosed evidence.  *See* Fed. R. Crim. P. 16(d)(2); *United States v. Ulbricht*, 858 F.3d 71, 115 (2d Cir. 2017).[1]

**B.      The Government's Last-Minute, Bare-Bones Expert Notice Is Woefully Insufficient**

**1.      The eleventh-hour notice violated the discovery order**

Sadr requested discovery, including notice of any expert testimony, two weeks after his March 2018 indictment.  The request specifically asked for a written summary of any expert testimony, a description of any expert witnesses' opinions and the bases and reasons for those opinions, and a description of each expert witness's qualifications, as called for under Rule 16(a)(1)(G).[2]  On April 11, 2018, the government represented, and the Court ordered, that discovery would be completed "within 60 days."  4/11/2018 Tr. at 13 (Dkt. No. 21).

---

[1] *Ulbricht*'s abrogation on other grounds was recognized in *United States v. Zodhiates*, 901 F.3d 137, 143-44 (2d Cir. 2018).

[2] Ltr. from B. Weiss to M. Laroche et al. ¶ 14 (Apr. 3, 2018) (attached as Ex. 1).

3

In mid-July 2018, the government told the Court it had complied with the order and "substantially completed its Rule 16 discovery obligations." 7/17/2018 Tr. at 2 (Dkt. No. 45). The government made no expert witness disclosures, and no reference to expert testimony.

In September 2018, current defense counsel adopted Sadr's previous discovery requests.[3] Though it responded to other specific issues raised by the defense, the government again made no expert witness disclosures, then or at any time until December 2019.[4]

Far from apparent oversight, this omission was consistent with the government's portrayal of a tightly limited case. At the same hearing where the government said it had completed its Rule 16 obligations, it urged an early 2019 trial, emphasizing the simplicity of its proof. 7/17/2018 Tr. at 2-3 ("[W]e think we are done producing discovery, and we are prepared to set a motion schedule and trial date today."); *id.* at 7 ("[W]e think the case is relatively straightforward. We set out a very detailed roadmap for the defense of the documents that we intend to rely upon . . . . [T]he case is, we think, not overly complicated . . . ."). When Sadr surveyed the government's representations in his last Rule 16 motion, the government acquiesced to litigating within those limits. *See* Dkt. No. 155 at 12; 11/25/2019 Tr. at 61-62 (Dkt. No. 169); 9/9/2019 Tr. at 35 (Dkt. No. 137) (acknowledging the government is bound by past conduct of the case).[5]

The government's disclosure of proposed expert testimony came on December 12, 2019—a year and a half after the discovery deadline and its representation that it had completed

---

[3] Ltr. from B. Heberlig to A. DeFilippis et al. at 2 (Sept. 25, 2018) (Dkt. No. 92-1).

[4] *See* Ltr. from A. DeFilippis et al. to B. Heberlig (Nov. 2, 2018) (Dkt. No. 92-2).

[5] Although those proceedings were focused on documents, when the Court asked about anything else the government had learned, the government made no mention of its Rule 16 disclosures being otherwise incomplete. *See* 9/9/2019 Tr. at 30 (Dkt. No. 137) (raising only document production in response to Court's request for update "with respect to any ongoing discovery or other issues"); *id.* at 38 ("That's the only update we have, your Honor.").

its Rule 16 obligations, less than three months before trial, and eight days before the motions in limine deadline.  The government's disclosure is nearly identical to that submitted in *United States v. Zarrab/Attila*, No. 15-cr-867 (RMB) (Aug. 16, 2017) (attached as Ex. 2).

"[W]ith increased use of both scientific and nonscientific expert testimony, one of counsel's most basic discovery needs is to learn that an expert is expected to testify."  *Ulbricht*, 858 F.3d at 114 (quoting Fed. R. Crim. P. 16, adv. comm. notes, 1993 amendment); *see also* Fed. R. Crim. P. 16, adv. comm. notes, 1974 amendment ("[I]t is difficult to test expert testimony at trial without advance notice and preparation.").  "The purpose of the expert disclosure requirement is to 'minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination.'"  *Ulbricht*, 858 F.3d at 114 (quoting adv. comm. notes to 1993 amendment).  "Defense counsel is entitled to plan his trial strategy on the basis of full disclosure by the government."  *United States v. McElroy*, 697 F.2d 459, 465 (2d Cir. 1982).

Here, the government's notice confirms that it has known the substance of the expert testimony it now offers since before Sadr's indictment.  Sadr was indicted in March 2018, and requested expert disclosures in April 2018.  In July 2018, the government stated its Rule 16 obligations were complete.  Nearly a year earlier, the government submitted its notice in *Zarrab/Atilla* describing the same testimony it intends to offer here.  Ex. 2.  Those witnesses testified in *Atilla* in November 2017.  Thus, when Sadr's counsel requested expert disclosures, the government knew its theory, its proposed witnesses, and the substance of their testimony.

There is no reason the government could not have responded promptly to Sadr's April 2018 request,[6] allowing Sadr and his counsel to prepare their defense from that time forward.

The government has offered no explanation for its failure to comply with the June 2018 deadline, despite Sadr's clear Rule 16(a)(1)(G) request and the government's equally clear statement that it had "substantially completed its Rule 16 discovery obligations." 7/17/2018 Tr. at 2. The most likely explanations—inattention, an unfounded and undisclosed belief that expert disclosures fell outside the Rule 16 deadline, or simple gamesmanship—are not acceptable excuses for failure to disclose, in response to direct request, information clearly required under the Rule. The government's only response was to state its disclosures were complete.

This Court has broad discretion to remedy violations of Rule 16, including by excluding undisclosed evidence. *See* Fed. R. Crim. P. 16(d)(2)(C); *Ulbricht*, 858 F.3d at 115. Factors guiding the Court's discretion include "the reasons why disclosure was not made, the extent of the prejudice, if any, to the opposing party, the feasibility of rectifying that prejudice by a continuance, and any other relevant circumstances." *Ulbricht*, 858 F.3d at 115 (citation omitted). "These factors are not exhaustive, nor is each necessarily required to support a sanction." *United States v. Nichols*, 169 F.3d 1255, 1268 (10th Cir. 1999).

An order enforcing a discovery deadline is not an "exclusionary 'sanction'" based on misconduct, but instead "simply enforce[s] the earlier pretrial order." *United States v. W.R. Grace*, 526 F.3d 499, 514 (9th Cir. 2008) (en banc). Prejudice, though relevant, is not required; the Court's interest in managing its own proceedings is sufficient. *See id.* at 515; *accord United States v. Wicker*, 848 F.2d 1059, 1061 (10th Cir. 1988) ("On occasion the district court may need

---

[6] The subjects of the proposed testimony—"the History of Sanctions Evasion Practices in Iran," " the Office of Foreign Assets Control," and "Standard Banking Industry Practices"—are general subjects taken from *Zarrab/Atilla* that do not depend on specific documents in this case.

to suppress evidence that did not comply with discovery orders to maintain the integrity and schedule of the court even though the defendant may not be prejudiced."); *United States v. Campagnuolo*, 592 F.2d 852, 858 (5th Cir. 1979) (finding no abuse of discretion when "a district judge for prophylactic purposes suppresses evidence . . . the government should have disclosed earlier"). Where a party agrees to a deadline when set (as the government did in April 2018 for all Rule 16 discovery), there is nothing unreasonable about enforcing it. *See W.R. Grace*, 526 F.3d at 514; *United States v. Ornelas*, 906 F.3d 1138, 1150 (9th Cir. 2018).

Here, the government's disclosure less than three months before trial of experts and planned testimony that were known and specifically requested before the discovery deadline a year and a half ago violates both the letter and spirit of Rule 16. From the time he was charged and requested discovery, Sadr has been entitled to prepare his trial defense based on timely disclosures under the rules—not late-hour surprises arising from gamesmanship or delay for its own sake. The government has given no reason it waited until now to disclose what it could have disclosed when Sadr requested it before the long-ago discovery deadline. This Court in its discretion should exclude the expert testimony based on this unjustified late disclosure alone. *See Ulbricht*, 858 F.3d at 114-15; *United States v. Sims*, 776 F.3d 583, 586 (8th Cir. 2015) (affirming exclusion of expert testimony noticed twelve days after disclosure deadline because government acted with reckless disregard of the deadline); *United States v. Banks*, 761 F.3d 1163, 1198-99 (10th Cir. 2014) (affirming exclusion of expert testimony where party offered no legitimate reason for failing to make timely disclosure); *United States v. Chalhoub*, No. 16-cr-23, 2018 WL 1477465, at *2-3 (E.D. Ky. Mar. 25, 2018) (excluding expert witness because the other party would be "prejudiced by having to prepare for an additional expert witness at this late stage in trial preparation [of] a complex case that parties have been preparing for nearly two years").

The government's extreme and unjustified delay, in violation of the discovery order and Rule 16(a)(1)(G), is alone sufficient to warrant exclusion.

### 2. The government's disclosures are insufficient under Rule 16

The government's expert witness disclosure is also insufficient for its failure to disclose any opinions the witnesses may offer, the bases of support for those opinions, or even the identities or qualifications of two of the three proposed witnesses.

Rule 16(a)(1)(G) requires the government to disclose, for any expert testimony, (i) "a written summary of [the] testimony"; (ii) a description of any opinions the witness may give; (iii) "the bases and reasons for those opinions"; and (iv) "the witness's qualifications." *Id.*[7]; *see Ulbricht*, 858 F.3d at 114. The requirement of the witness's qualifications permits the defendant to challenge "whether in fact the witness is an expert." Rule 16, adv. comm. notes, 1993 amendment. The summary of expected testimony "is intended to permit more complete pretrial preparation by the requesting party," by letting the party know, for instance, "whether the expert will be providing only background information on a particular issue or whether the witness will actually offer an opinion." *Id.* If the witness is to offer an opinion, the "most important" requirement is "a summary of the bases of the expert's opinion." *Id.* That summary must include all bases relied upon by the expert—including "not only written and oral reports, tests, reports, and investigations, but any information that might be recognized as a legitimate basis for an opinion under Federal Rule of Evidence 703, including opinions of other experts." *Id.*

---

[7] **(G) Expert witnesses.**—At the defendant's request, the government must give to the defendant a written summary of any testimony that the government intends to use under [Federal] Rules [of Evidence] 702, 703, or 705 . . . . The summary . . . must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.

Fed. R. Crim. P. 16(a)(1)(G).

Here, the government's disclosure provides only a list of topics of proposed testimony, and a scant summary of the qualifications of one of them (Mark Dubowitz). *See* Ex. 3. For the other two proposed experts—an OFAC expert and a banking expert—the government does not even disclose the witnesses' names, much less their qualifications. *See id.*[8] The notice discloses no opinions by any expert witness, much less "the bases and reasons for those opinions." Rule 16(a)(1)(G). This is precisely the sort of notice found "plainly inadequate" in *Ulbricht*:

> Not only were the disclosures late, more importantly, they were plainly inadequate. Both disclosures merely listed general and in some cases extremely broad topics on which the experts might opine. For example, the disclosures indicated that the experts would testify on general topics, including: [subjects related to Bitcoin in that case]. They did not summarize the experts' opinions about those topics, let alone describe the bases for the experts' opinions.

858 F.3d at 115. Based on these inadequacies, the Second Circuit upheld exclusion of the proposed expert testimony. *Id.* The same result is warranted here.

At a minimum, even if the witnesses are permitted to testify about background facts identified in the list of topics (such as "OFAC's licensing, designation, and enforcement authority," or "[s]tandard banking practices regarding the maintenance of correspondent banking

---

[8] The government attached the testimony of the OFAC witness who testified at the *Atilla* trial (Lisa Palluconi), but did not name the OFAC witness it intends to offer in Sadr's trial, or provide any qualifications. *See* Ex. 3 at 2.

The commentary to Rule 16 notes that "[i]n some instances, a generic description of the likely witness and that witness's qualifications may be sufficient, e.g., where a DEA laboratory chemist will testify, but it is not clear which particular chemist will be available." Rule 16, adv. comm. notes, 1993 amendment. This exception arguably might cover an OFAC official if that person's position at OFAC is sufficient to ensure relevant knowledge—though the pool of such OFAC officials is likely much smaller and not as easily interchangeable as DEA laboratory chemists. The "generic witness" exception is not sufficient, however, to cover as broad a witness pool as "one or more representatives of major international banks." Ex. 3 at 3. "Representatives of major international banks" are far too numerous, and of varied knowledge and qualification, to be covered by a generic notice, and the government offers no generic statement of qualifications, as it might for a DEA chemist (or an OFAC representative). Instead, the government promises to provide the witness's biography and C.V. whenever he or she is identified (Ex. 3 at 3)—a promise tantamount to providing no advance notice of qualifications at all.

relationships"), none of the government's proposed witnesses should be permitted to testify to any opinion, the government having failed to disclose such opinions or the bases therefor. *See, e.g.*, *Ulbricht*, 858 F.3d at 115; *United States v. Holmes*, 670 F.3d 586, 599 (4th Cir. 2012) (affirming exclusion because the disclosure did not provide the bases and reasons for the expert's opinion); *Daniels v. City of New of York*, No. 16-cv-9080 (AJN), 2018 WL 5919307, at *3 (S.D.N.Y. Nov. 13, 2018) (excluding expert's opinion for failure to identify the bases for the opinion); *On Track Innovations Ltd. v. T-Mobile USA*, 106 F. Supp. 3d 369, 417 (S.D.N.Y. 2015) (excluding expert opinion because although expert identified the "factors" underlying her conclusion, "her report ultimately provides no roadmap to the [conclusion]").

The government's attachment of transcripts of a different trial is not a substitute for the disclosure required under Rule 16(a)(1)(G), particularly a summary of any opinions and their bases to be offered in *this* trial. Review of the *Atilla* transcripts did not disclose any opinions identified as such, much less any bases identified for those opinions. Sadr's right to notice of the witnesses' opinions and their bases, for his preparation to cross-examine them or call rebuttal experts at his own trial, cannot be limited to what is implicit in testimony from a different trial.[9]

Because the government's expert disclosure violates both the timing and substantive requirements of Rule 16(a)(1)(G), the proposed expert testimony, especially any opinion testimony, should be excluded.

---

[9] In the alternative, at most, any such testimony must be strictly limited to what was disclosed—no government expert at Sadr's trial may go beyond any opinion or basis that is contained in the government's attached transcripts.

## II. The Court Should Exclude Testimony About the Iranian Government's Support for Terrorism, Nuclear Proliferation, Hostage-Taking, "Economic Jihad," and the Like Because Its Extreme Unfair Prejudice Outweighs Its Minimal Probative Value

The government's expert disclosures are taken directly from *Atilla*; the government openly intends a simple replay of the expert testimony it sought to present there (including topics not admitted under Judge Berman's order).[10] This Court should reject the government's effort to cut and paste its presentation from *Atilla*, which was a vastly different case from this one. In particular, the Court should prohibit testimony about the Government of Iran's support for terrorism, hostage-taking, nuclear proliferation, "economic jihad," and the like. Those inflammatory topics, relevant to the government's theory in *Atilla*, have nothing whatsoever to do with this case, which concerns payments for a lawful third-country construction project performed by a private company unaffiliated with the Government of Iran. Especially in light of recent events, testimony connecting those subjects to the sanctions charged here will have such extreme and unfair prejudicial effect that a fair trial for Sadr will be impossible.

The Second Circuit has made abundantly clear that "evidence linking a defendant to terrorism in a trial in which he is not charged with terrorism is likely to cause undue prejudice" under Rule 403. *United States v. Al-Moayad*, 545 F.3d 139, 166 (2d Cir. 2008) (quoting *United States v. Elfgeeh*, 515 F.3d 100, 127 (2d Cir. 2008)). In post-September-11 New York City, the likelihood and degree of such unfair prejudice is so overwhelming that admission of terrorism evidence in a non-terrorism trial is likely reversible error. Indeed, even where defendants were charged with supporting Hamas and Al-Qaeda, the Second Circuit held that "inflammatory,

---

[10] Of the sixteen bulleted topics in the government's expert disclosure notice, thirteen are taken directly (and often word-for-word) from the *Atilla* notice, including multiple topics that were not ultimately part of the testimony Judge Berman approved. *Compare* Ex. 3 (Sadr notice) *with* Ex. 2 (*Atilla* notice) *and* Order, *Atilla*, Dkt. No. 357 (Nov. 22, 2017).

highly charged" testimony about terror attacks not charged against them created such a danger of "lur[ing] the fact finder into declaring guilt on a ground different from proof specific to the offense charged" that the convictions had to be vacated. *Al-Moayad*, 545 F.3d at 166.

Here, the government offers the same testimony it put on in *Atilla*, from think tank CEO Mark Dubowitz and an OFAC official. Mr. Dubowitz testified about the "economic jihad" called for by Iran's Supreme Leader, Ayatollah Ali Khamenei, to oppose "[t]he sanctions which were imposed on us by the enemies of our nation," 11/28/2017 Tr. at 157, *Atilla*, Dkt. No. 400, and to endorse "the use of any measures, including sanctions evasion in order to try and fortify Iran against the use of these economic measures." *Id.* at 158. He described the Iranian sanctions' origin "after U.S. citizens were taken hostage in the U.S. embassy in Iran," *id.* at 162, and attributed to "Iran and its terrorist surrogates, including Hezbollah," responsibility "for numerous terrorist attacks against Americans and other foreign nationals," including "attacks on our embassies," and "the bombing of our marine barracks [in Beirut], which killed 241 marines." *Id.* at 162-63. Mr. Dubowitz testified that the Iranian sanctions were originally designed to stop the Iranian government from supporting terrorism, "to punish that activity[,] and to deny the Iranian regime the money it needed in order to fund its terrorist activity." *Id.* at 163.

Mr. Dubowitz also described U.S. concern about Iran's covert nuclear program, *id.* at 163-64, the role of the Islamic Revolutionary Guard Corps (IRGC) in nuclear proliferation, and the IRGC Quds Force, the wing responsible for "the majority of [IRGC] terrorist activities." *Id.* at 165. According to Mr. Dubowitz, the IRGC controls a large segment of the Iranian economy, with heavy involvement in "the financial sectors, commercial sectors, extensive interest in construction, and energy and the defense industries," *id.*, and direct or indirect control of "about 20 percent of the Tehran Stock Exchange." *Id.* at 166. All in all, Mr. Dubowitz referenced

terrorism or terrorist attacks 24 times, nuclear proliferation 18 times, the Islamic Revolutionary Guard and/or the Quds Force 11 times, "economic jihad" 4 times, and the taking of American hostages twice, in the span of one afternoon's testimony.

The OFAC official, in addition to testifying about the origin of IEEPA and ITSR, described the declaration of national emergency in 1979 dealing with the Iranian hostage situation, *id.* at 99, and surveyed executive orders and regulations under the Weapons of Mass Destruction Proliferators Sanction Program, *id.* at 105-06, 118-21, the National Defense Authorization Act, *id.* 121-25, the Iran Threat Reduction and Syria Human Rights Act, *id.* at 126-27, and the Iran Freedom and Counterproliferation Act, *id.* at 129. All of those laws prohibited transactions involving certain Iranian banks and companies blocked on the SDN list or narrowed exceptions to those prohibitions. In contrast, this case does not involve any transactions with any Iranian banks or any companies on the SDN list.

The above testimony was arguably relevant in *Atilla*, because the government's theory of that case was that the defendants laundered through their Turkish bank more billions of dollars in Iranian Government oil sale proceeds—money belonging to the Government of Iran and companies on the SDN list—through completely fictitious money transfers, which they covered up by paying millions of dollars in bribes to high-level Turkish government officials.[11] The government deemed relevant the purpose of the sanctions—to limit Iran's ability "to fund and promote illicit activities" like terrorism—because it contended that the defendants conspired to set up a "slush fund" that the Government of Iran could use "to make illicit payments all over the

---

[11] *See id.* at 19-21 (opening statement). The government claimed Zarrab and Attila laundered $6.3 billion belonging to the Government of Iran within the first year of that conspiracy. *Id.* That is more than 50 times the total amount of the payments charged in this case, none of which are alleged to have gone to the Government of Iran or any blocked entity.

world." *Id.* at 32. By engaging in the same type of "payments that made the whole process necessary in the first place . . . ," the government argued Atilla "threatened the national security of our country." *Id.* at 19, 32. The government also offered evidence that Zarrab wrote letters to the Iranian government "pledg[ing] his allegiance to the economic jihad and offer[ing] to help Iran launder its money," and argued that "[w]hen the Ayatollah declared the economic jihad, all that money in Atilla's bank was a big part of it." *Id.* at 25.

Sadr's case, however, has nothing to do with the facts tried in *Atilla*. The allegations here do not involve money belonging to or being transferred to the Iranian government or any SDN. Instead, this case concerns payments for a private company's lawful construction of housing in a third country, which is not prohibited by the Iran sanctions. Unlike in *Atilla*, these payments are not alleged to have been part of any "economic jihad," or to have inured to the benefit of any terrorist, SDN, or the Iranian government itself. The only alleged criminality charged in this case is the use of U.S.-based intermediary banks to process clearing transactions between non-Iranian foreign banks, in a correspondent-banking framework that was undisputedly legal until November 2008, and whose legality thereafter is disputed in this case. The superficial similarity that both cases involve the Iran trade sanctions in no way makes *Atilla* a precedential roadmap, much less a predicate for the wholesale importation of the expert testimony admitted there.

Importation of that testimony about Iranian government support for terrorism, nuclear proliferation, hostage-taking, and "economic jihad," in a case where none of those issues are present, will cause extreme unfair prejudice, while contributing no probative value on the issues disputed in this trial. Testimony that other people of Sadr's nationality have committed acts of terrorism and caused the deaths of hundreds of Americans would cause enormously unfair prejudice and likely render a fair trial impossible. Even before recent events, allowing expert

witnesses to describe Iranian responsibility for taking American hostages, bombing American embassies and Marines, supporting Hezbollah, and proliferating weapons of mass destruction would unfairly tar Sadr with topics overwhelmingly likely to inflame jurors' passions against him, in a case where he is not remotely accused of supporting any of those things.

Recent events have multiplied that risk exponentially. On January 2, the United States killed General Qassim Soleimani, the longtime leader of the IRGC Quds Force, in a targeted drone attack. The U.S. government has claimed Soleimani was planning imminent attacks on Americans, and was responsible for Iran's support of terrorism (including Hamas and Hezbollah) and proxy attacks against Americans.[12] Iran's Supreme Leader, the Ayatollah Ali Khamenei, has sworn revenge against the United States,[13] and Iran has responded with rocket and missile attacks on the Green Zone and military bases in Iraq where U.S. soldiers are stationed.[14] Iranian-

---

[12] *See* Michael Crowley, Falih Hassan and Eric Schmitt, "U.S. Strike in Iraq Kills Qassim Suleimani, Commander of Iranian Forces," *The New York Times*, Jan. 2, 2020, https://www.nytimes.com/2020/01/02/world/middleeast/qassem-soleimani-iraq-iran-attack.html?action=click&module=RelatedLinks&pgtype=Article; Reuters, "Pentagon Says Iranian Commander Soleimani Was Developing Plans to Attack Americans," *The New York Times*, Jan. 3, 2020, https://www.nytimes.com/reuters/2020/01/03/world/middleeast/03reuters-iraq-security-blast-pentagon.html?searchResultPosition=25; Michael Crowley and Eileen Sullivan, "Trump Claims Iranians Were Plotting to Blow Up American Embassy," *The New York Times*, Jan. 9, 2020, https://www.nytimes.com/2020/01/09/us/politics/suleimani-embassy.html?searchResultPosition=9; Tim Arango, Ronen Bergman and Ben Hubbard, "Qassim Suleimani, Master of Iran's Intrigue, Built a Shiite Axis of Power in Mideast," *The New York Times*, Jan. 3, 2020, https://www.nytimes.com/2020/01/03/obituaries/qassem-soleimani-dead.html?action=click&module=RelatedLinks&pgtype=Article.

[13] *See* Farnaz Fassihi and Richard Perez-Pena, "Iranians Close Ranks Behind Leaders After U.S. Kills Popular General," *The New York Times*, Jan. 4, 2020 ("[I]n Iran, politicians and ordinary people of all stripes voiced support for the vow by the supreme leader, Ayatollah Ali Khamenei, that 'severe revenge awaits those criminals' who killed the general."), https://www.nytimes.com/2020/01/04/world/middleeast/iran-suleimani-killing.html?action=click&module=RelatedLinks&pgtype=Article.

[14] The Associated Press, "Rockets Fired After Day of Mourning for Slain Iranian Leader," *The New York Times*, Jan. 4, 2020, https://www.nytimes.com/aponline/

backed militia groups also recently occupied the Green Zone.[15]  These are daily headlines and

nightly news crawls, about which every juror is likely to have strong feelings.[16]

Especially in this environment, allowing the government to tie its case against Sadr to

Iranian support for terrorism or "economic jihad"—merely to give the jury background about the

sanctions' origins and purpose—would wreak overwhelming unfair prejudice, and deny Sadr any

chance at fair, impartial consideration by the jury.

### III.    The Court Should Not Allow the Proposed Experts to Testify to Hearsay or Otherwise Inadmissible Testimony

Unless allowed by statute or rule, hearsay evidence is inadmissible.  Fed. R. Evid. 802.

Similarly, evidence of other crimes by other people is inadmissible, because the defendant may

be convicted only for the crimes charged against him in the indictment.  *See, e.g.*, *United States*

*v. Castillo*, 924 F.2d 1227, 1234 (2d Cir. 1991) ("[W]e take serious issue with the Government's

use of an expert witness to propound the impermissible theory that appellants' guilt could be

inferred from the behavior of unrelated persons.").  The government should not be permitted to

use its proposed experts to offer prohibited hearsay evidence, or statements about methods of

---

2020/01/04/world/middleast/ap-ml-iraq-soleimani.html?searchResultPosition=11; The Associated Press, "Iran Strikes Back at US With Missile Attack at Bases in Iraq," *The New York Times*, Jan. 7, 2020, https://www.nytimes.com/aponline/2020/01/07/world/middleast/ap-ml-iran-soleimani.html?searchResultPosition=22.

[15] *See* Falih Hassan and Alissa J. Rubin, "Pro-Iranian Protesters End Seige of U.S. Embassy in Baghdad," *The New York Times*, Jan. 1, 2020, https://www.nytimes.com/2020/01/01/world/middleast/us-embassy-baghdad-iraq.html?action=click&module=RelatedLinks&pgtype=Article.

[16] *See, e.g.*, Susan Page, "Exclusive: Americans say Soleimani's killing made US feel less safe, Trump 'reckless' on Iran," *USA Today*, Jan. 9, 2020 (noting 69% of poll respondents agreed "the attack made it more likely Iran would strike American interests in the Middle East," 63% agreed "that there would be terrorist attacks on the American homeland," and 62% agreed "that the United States and Iran would go to war"), https://www.usatoday.com/story/news/politics/2020/01/09/killing-soleimani-made-us-less-safe-trump-reckless-iran-poll/2835962001/.

crime allegedly employed by others, in the guise of testimony about the sanctions' background or history, or the methods by which others assertedly attempt to violate or evade them.

### A.    Expert Testimony Cannot Be Used as a Vehicle for Inadmissible Hearsay

Federal Rule of Evidence 703 contains a limited exception to the prohibition on hearsay for experts: "[a]n expert may base *an opinion* on facts or data in the case that the expert has been made aware of or personally observed.  If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted."  *Id.* (emphasis added).  Thus, an expert may describe facts not based on firsthand knowledge if they are the basis for his or her opinion, and are the kind of facts that other experts in the particular field would rely upon in forming such an opinion.

But that exception does not apply here for a simple reason: the government has not disclosed or summarized any opinion to which any of its experts will testify.  Nor has the government disclosed or summarized any basis for any such opinion, as Rule 16(a)(1)(G) requires.  *See* Section I.B, *supra*.  Having not disclosed any expert opinion or basis therefor that it intends to offer, there is no reason for any expert witness to offer any otherwise inadmissible testimony to support any such opinion.

Rule 16's drafters recognized that some expert witnesses may "provid[e] only back-ground information on a particular issue," without "actually offer[ing] an opinion."  Rule 16, adv. comm. note, 1993 amendment.  But neither the criminal rules nor the evidentiary rules extend to such witnesses the ability to thereby engage in hearsay or otherwise inadmissible testimony.  Instead, the privilege of relying on otherwise inadmissible information to form the basis for an opinion is limited to those actually offering opinions.  *See* Rule 703 (quoted *supra*); *United States v. Mejia*, 545 F.3d 179, 197 (2d. Cir. 2008) ("The expert may not, however, simply

17

transmit hearsay to the jury. Instead, the expert must form his own opinions by 'applying his extensive experience and a reliable methodology' to the inadmissible materials.") (quoting *United States v. Dukagjini*, 326 F.3d 45, 57 (2d Cir. 2003)). Expert witnesses cannot testify to regulatory history or otherwise inadmissible background information without it being necessary to the formation of an opinion. *See, e.g.*, *In re Mirena IUD Prods. Litig.*, 169 F. Supp. 3d 396, 478 (S.D.N.Y. 2016) (holding that an expert could rely upon regulatory history to form regulatory opinions, but she could not "merely repeat[] facts" learned from the regulatory history); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 551 (S.D.N.Y. 2004) (holding that "background . . . to the extent it is admissible, is properly presented through percipient witnesses and documentary evidence" and that "an expert is not required" where they are simply reporting on what a regulatory committee did).

In *Atilla*, over defense objection, these experts testified extensively to hearsay beyond their personal knowledge. Mr. Dubowitz, for instance, described Iranian government-supported terrorist attacks including death counts, testified about what percentage of the Iranian economy is assertedly controlled by the IRGC, described how the IRGC controlled companies, and discussed whether certain transactions were illegal. *E.g.*, 11/28/2017 Tr. at 163, 165, 166, 186, *Atilla*, Dkt. No. 400. None of this testimony was based on his firsthand perception—it was all based on out-of-court statements and their asserted truth. Because that out-of-court information was not the basis of an offered opinion, it should not have been admitted.

Even if such hearsay evidence did form the basis of a proper expert opinion, such evidence is admissible "only if [its] probative value in helping the jury evaluate the opinion substantially outweighs [its] prejudicial effect." Fed. R. Evid. 703; *see also* Fed. R. Evid. 403. Here, evidence regarding the Iranian government's support of terrorism, hostage-taking,

proliferation of weapons of mass destruction, "economic jihad," and the like, would be

overwhelmingly prejudicial, while its probative value in determining whether Sadr's conduct

violated the ITSR would be nil. *See* Section II, *supra*. The government cannot smuggle that

testimony in under Rules 702 and 703, any more than under Rules 402 and 403.

**B.      The Proposed Experts Should Be Prohibited from Propounding the Impermissible Theory that Sadr's Guilt Can Be Inferred from the Behavior of Unrelated Persons**

The government intends to offer purported expert testimony about claimed methods by

which other Iranians allegedly evade sanctions or launder money, to urge that Sadr's conduct

matches those claimed techniques, and thus either constitutes illegal activity or is indicative of it.

This Court should bar any such testimony of alleged criminal activity by others offered to infer

Sadr's guilt based on similar activity. *See, e.g.*, *Castillo*, 924 F.2d at 1234.

The government has noticed Mr. Dubowitz as a proposed expert on the "History of

Sanctions Evasion Practices in Iran," Ex. 3 at 1, and proposes that he testify regarding "sanctions

evasion practices," the "ways in which Iranian entities evade U.S. and European sanctions,"

"patterns of financial activity that are consistent with money laundering . . . and sanctions

evasion," the roles of "key players in the Iranian government, economy and society" play in

attempts to evade U.S. sanctions. *Id.* at 2. Similarly, the government proposes to have one or

more bank representatives testify about "[c]ommon methods of money laundering and sanctions

evasion, such as wire stripping and layering"—terms the government does not define. *Id.* at 3.

It is well established that the government cannot call an expert witness to testify that

engaging in the conduct undertaken by Sadr constitutes a crime. *See, e.g.*, *United States v. Scop*,

846 F.2d 135, 139 (2d Cir. 1988) (holding that opinions that defendants' conduct constituted

"manipulation" or "fraud" were legal conclusions well beyond a witness's province as an expert

in securities trading); *see also DiBella v. Hopkins*, 403 F.3d 102, 121 (2d Cir. 2005) (expert testimony that a party's actions "amounted to extortion" was properly excluded). This Court, not a government witness, defines the elements of the charged crimes under the law, and the jury decides whether Sadr committed those crimes. No expert may invade the Court's and the jury's respective roles. *See* Section IV, *infra*. The government nonetheless is attempting to sneak in through the side door testimony that cannot come in through the front—having an expert testify that certain conduct commonly indicates certain crimes, knowing that Sadr is charged with those crimes and the government will attempt to show Sadr engaged in that conduct.

The Second Circuit has repeatedly emphasized the government cannot offer expert testimony about the practices of other people "for the impermissible purpose of encouraging the inference of appellants' guilt from the behavior of unrelated persons." *Castillo*, 924 F.2d at 1231 (vacating conviction based on expert testimony that drug dealers force their customers to ingest cocaine to determine whether they are police officers); *accord United States v. Cruz*, 981 F.2d 659, 663 (2d Cir. 1992) ("[A]s we stated in *Castillo*, guilt may not be inferred from the conduct of unrelated persons."); *United States v. Mulder*, 273 F.3d 91, 102 (2d Cir. 2001) ("What the government cannot do is to ask the jury to find that because criminals of a certain type classically engage in a certain kind of behavior, the defendant engaged in that behavior."). Thus, the government may not put on testimony to argue that "sanctions evaders and money launderers do X"; "Sadr did X"; therefore, "Sadr was evading sanctions and laundering money."[17]

---

[17] Nor may the government avoid the prohibited inference by stopping one step short, admitting testimony that the defendant's conduct was "consistent with" criminal behavior, while leaving the final connection of the dots to the jury. *See United States v. Long*, 917 F.2d 691, 702 (2d Cir. 1990) (purported expert's use of generalized patterns of conduct rather than the facts of the case was inadmissible; "*because it was generalized*, cross-examination could not blunt its prejudicial effect.") (emphasis added).

Instead, pattern or modus operandi evidence is properly admissible only when it is necessary to decipher the language, customs, or activities of a closed or secretive group. In *Mejia*, the Second Circuit reviewed the evolution of modus operandi evidence over the past twenty years, from the permissible translation of coded language, to the sometimes-permissible explanation of secretive organization operations, to the impermissible substitution of expert opinion for fact evidence. *See* 545 F.3d at 189-90. The court concluded that to be admissible, expert testimony regarding "the operation, symbols, jargon, and internal structure of criminal organizations" must be that of "a sociologist describing the inner workings of a closed community [of which the defendant is a member]," and ***not*** merely that of one "whose pronouncements on elements of the charged offense serve as shortcuts to proving guilt." *Id.* at 190. The entire Iranian people are not a "closed community" or secret group akin to a drug trafficking organization or organized crime family, and the government may not paint with a broad brush to urge that because some Iranian people evade sanctions or launder money by engaging in certain conduct, then Sadr must have been evading sanctions or laundering money when he engaged in similar conduct. The government's proposal is no different than offering impermissible "expert" testimony that bribes are often paid to officials through third-party middlemen, to argue that since the defendant employed a third-party middleman, he was likely paying a bribe.

In *Mejia*, the Second Circuit explicitly reaffirmed its limitation in *Castillo* that expert testimony about modus operandi should be limited to subject matter that is beyond the ken of the average juror. Here, there is nothing complicated, for instance, about allegations that Sadr sought to remove references to Iran in documents, or directed the Venezuelan company to pay invoices to companies other than the Iranian International Housing Corporation—in the

21

government's view, to evade the sanctions. There is no need to have a banking expert explain common methods of money laundering or sanctions evasion. *See, e.g.*, Ex. 3 at 2. Courts have rejected similar testimony. *See Long*, 917 F.2d at 702 (holding that the district court erred by permitting expert testimony because a jury is capable of understanding how a typical illegal kickback scheme works, and the expert testimony was "relevant only as background information"); *In re LIBOR-Based Fin. Instrs. Antitrust Litig.*, 299 F. Supp. 3d 430, 469 (S.D.N.Y. 2018) ("Expert testimony that seeks to address lay matters which the trier of fact is capable of understanding and deciding without the expert's help is not relevant and is therefore inadmissible.").

## IV.     Any Proposed Expert Testimony Should Be Subject to *Daubert*

### A.     Legal Standard

Expert evidence can only be admitted if it satisfies Rule 702 under *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993). *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 147-48 (1999). Under Rule 702,

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b)  the witness's testimony is based on sufficient facts or data;
> (c)  the testimony is the product of reliable principles and methods; and
> (d)  the expert has reliably applied the principles and methods to the facts of the case.

*Id.* The party seeking to introduce expert testimony "bears the burden of establishing its admissibility by a preponderance of the evidence." *Baker v. Urban Outfitters*, 254 F. Supp. 2d 346, 353 (S.D.N.Y. 2003).

The trial judge acts a "gatekeeper," to "ensure that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597.  The Second Circuit has advised courts to "focus on the principles and methodology employed by the expert," and to exclude the testimony if those principles and methodology are unreliable, *In re Pfizer Sec. Litig.*, 819 F.3d 642, 662 (2d Cir. 2016); if the witness is not actually applying expert methodology, *Dukagjini*, 326 F.3d at 54; or if "there is simply too great an analytical gap between the data and the opinion proffered," leaving the testimony "connected to existing data only by the *ipse dixit* of the expert."  *Gen. Elec. Co.. v. Joiner*, 522 U.S. 136, 146 (1997).  "[M]ere ipse dixit is not appropriate expert testimony."  *SEC v. Tourre*, 950 F. Supp. 2d 666, 678 (S.D.N.Y. 2013) (citing *Daubert*, 509 U.S. at 592-94).  The Court's exclusion of expert testimony will be affirmed unless it constitutes an abuse of discretion.  *See Gen. Elec.*, 522 U.S. at 139, 142.

### B.    The Court Should Exclude the Proposed Expert Testimony of Mark Dubowitz

The Court should prohibit Mr. Dubowitz from offering any opinion testimony unless he shows a sufficient basis and methodology to support his opinion under *Daubert*.  While Sadr reserves the right to object to specific opinions and bases if and when they are disclosed, the government's current disclosure shows that Mr. Dubowitz's testimony on the government's proposed topics should be excluded because he has not provided any evidence of specialized knowledge on the general subject for which his testimony is offered or for five of the six listed sub-topics; those topics are unhelpful to the jury's determination of whether Mr. Sadr committed the charged crimes; the proposed testimony is not supported by sufficient facts or data, and not

the product of reliable principles or methods; and Mr. Dubowitz has not reliably applied those

principles or methods to the facts of this case.

> ## 1. Mr. Dubowitz is not qualified as an expert on the "history of sanctions evasion practices in Iran"

"To determine whether a witness qualifies as an expert, courts compare the area in which

the witness has superior knowledge, education, experience, or skill with the subject matter of the

proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004) (citing

*United States v. Diallo*, 40 F.3d 32, 34 (2d Cir. 1994)). It is not enough to be an expert in some

field; the expert's specialized knowledge must match the subject of his proposed testimony.

*Tourre*, 950 F. Supp. 2d at 679 ("Being a professional testifying expert in the financial area does

not give an individual the qualification to opine in every financial area as to every type of

analysis."); *Arista Records v. Lime Group*, No. 06-cv-5936, 2011 WL 1674796, at *2 (S.D.N.Y.

May 2, 2011) ("An expert who is qualified in one field cannot offer an opinion about aspects of

the case in another field for which she is not qualified.").

Here, the government has not shown Mr. Dubowitz has any expertise or specialized

knowledge on the subject for which he is proffered: "the history of sanctions evasion practices in

Iran." Mr. Dubowitz's C.V. does not list any experience or training related to sanctions evasion,

such as training in forensic accounting, fraud analysis, sanctions or law enforcement, or legal

representation of entities dealing with sanctions. Simply serving as a professional expert—even

one who has testified in the past—does not qualify someone who has not engaged in the subject

activity outside the context of providing expert services. *See Tourre*, 950 F. Supp. 2d at 677-78

(finding proposed financial expert unqualified to testify about a collateral debt obligation

("CDO"), even though he had testified as an expert in a past CDO case, because he had "no

specialized knowledge, expertise, or training in CDO structuring, marketing, or investing," and "no experience in the CDO industry apart from acting as an expert witness"); *id.* at 679 ("'[I]t would be absurd to conclude that one can become an expert simply by accumulating experience in testifying.'") (quoting *Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 800 (4th Cir. 1989)).

Mr. Dubowitz may have some knowledge of what he believes to be sanctions evasion practices, but that does not qualify him as an expert on that topic. *See Daniels*, 2018 WL 5919307, at *5 (holding that expertise in injury biomechanical analysis combined with limited medical training was insufficient to qualify the witness as a medical expert able to testify regarding the type of injury caused by an accident). Mr. Dubowitz is therefore unqualified to testify as an expert on this subject matter.

The government's only offered support for Mr. Dubowitz's supposed expertise in the history of sanctions evasion practices in Iran is its claim that Mr. Dubowitz was previously qualified as an expert on that subject in *Atilla*. Ex. 3 at 1. Even if prior qualification alone were sufficient—which it is not—the government is flatly wrong: Mr. Dubowitz was not qualified as an expert on "the history of sanctions evasion practices in Iran and Turkey" in *Atilla*. Though the government noticed him as an expert in that subject, *see* Ex. 2, the Court never qualified him, and he never testified on it—he testified only as an expert on "Iran and Iran sanctions." 11/28/2017 Tr. at 154, *Atilla*, Dkt. No. 400.[18]  Indeed, Judge Berman issued an order

---

[18] Despite its notice claiming Mr. Dubowitz's expertise on this subject, the government actually proposed to have FDD employee Dr. Jonathan Schanzer—not Mr. Dubowitz—testify on the patterns of financial activity consistent with money laundering and sanctions evasion. *See* Ltr. from Michael D. Lockard et al. to Benjamin Brafman et al., *Atilla*, Dkt. No. 321-1 (attached as Ex. 2). In the end, neither Mr. Dubowitz nor Dr. Schanzer was qualified as an expert in

enumerating the permissible areas of expert testimony that did not include sanctions evasion among its topics. Order ¶ 9, *Atilla*, Dkt. No. 357. There is no evidence in the *Atilla* record that would justify the conclusion that Mr. Dubowitz has the "scientific, technical, or other specialized knowledge" necessary to provide expert testimony on sanctions evasion practices, whether in Iran, Turkey, or elsewhere.

> **2.  Mr. Dubowitz is not qualified as an expert on five of the six subtopics in the government's notice**

The same is true for five of the six topics the government has listed under the "history of sanctions evasion practices in Iran" heading. The government has not provided any supporting qualifications showing Mr. Dubowitz has any "specialized knowledge, expertise, or training," *Tourre*, 950 F. Supp. 2d at 677, nor any real-world professional experience, *id.* at 678, in any of the following topics:

- Iran's "Economic Jihad" and adoption of a "resistance economy," and the various and evolving ways in which Iranian entities evade U.S. and European sanctions;

- Patterns of financial activity that are consistent with money laundering, including trade-based money laundering, and sanctions evasion;

- The role that key players in the Iranian government, economy, and society played in Iran's attempt to evade U.S. sanctions, including the IRGC's role in the Iranian government and economy, its control over various sectors of that economy, and its use of different corporate entities to conduct and conceal its commercial activity;

- The relationship between the Governments of Iran and Venezuela; or

- The relationship between private Iranian entities, including Stratus Holding Group and its various components, and the Government of Iran.

---

sanctions evasion practices; there was no expert testimony on that subject in *Atilla*, and Dr. Schanzer did not testify at all.

Because the government has provided no qualifications showing Mr. Dubowitz's specialized knowledge, expertise, training, or real-world experience on any of these topics, the Court should preclude Mr. Dubowitz from offering expert testimony on any of them.

The only topic on the government's disclosure for which Mr. Dubowitz does appear to have specialized knowledge is the history of the Iranian trade sanctions—the first listed topic. If he is permitted to testify at all, Mr. Dubowitz's testimony should be limited to that topic. Even as to that topic, Mr. Dubowitz should not be permitted to testify regarding the terrorism support, terrorist attacks, nuclear proliferation, and "economic jihad" that dominated his *Atilla* testimony. *See* Section II, *supra*. Nor should he be permitted to testify on the history of the Iran trade sanctions that duplicates testimony from the government's OFAC representative.

### 3.   Mr. Dubowitz's proposed testimony would not help the jury

"One of the fundamental requirements of Rule 702 is that the proposed testimony 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Highland Capital Mgm't v. Schneider*, 379 F. Supp. 2d 461, 468 (S.D.N.Y. 2005) (quoting *Rezulin*, 309 F. Supp. 2d at 540). "In deciding whether expert testimony will be helpful, to the fact-finder, the Court must determine whether the testimony 'usurps either the role of trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it.'" *Highland Capital*, 379 F. Supp. 2d at 468 (quoting *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999)). "In addition, expert testimony is inadmissible when it addresses 'lay matters which a jury is capable of understanding and deciding without the expert's help.'" *Id.* (quoting *Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989)).

As set forth in Section II, *supra*, Mr. Dubowitz's proposed testimony about the history and purpose of the Iran sanctions, including Iran's role in terrorist attacks, human rights abuses, a

nuclear program, and an "economic jihad" against the United States, would not be helpful to the jury because this case does not involve the government of Iran (unlike the *Atilla* case on which this testimony is modeled). Similarly, as set forth in Section III.B, *supra*, testimony about how other Iranians have allegedly violated the sanctions would not help the jury because the conduct at issue is easy to understand.

4. **The government has not carried its burden to prove that Mr. Dubowitz's opinions are (i) supported by sufficient facts or data and (ii) the product or reliable principles and methods**

Rule 702(b) requires the proponent of expert testimony to demonstrate that the testimony is based on sufficient facts or data before it can be admitted. Similarly, Rule 702(c) requires the proponent of expert testimony to demonstrate that the testimony is the product of reliable principles and methods. *See Amorgianos v. Nat'l R.R. Pass'r Corp.*, 303 F.3d 256, 265 (2d Cir. 2012). In order to determine whether proposed expert testimony satisfies the "reliability" requirement, the court must consider factors including "the theory's testability, the extent to which it 'has been subjected to peer review and publication,' the extent to which a technique is subject to 'standards controlling the technique's operation,' the 'known or potential rate of error,' and the 'degree of acceptance' within the 'relevant scientific community.'" *United States v. Romano*, 794 F.3d 317, 330 (2d Cir. 2015). This is not a checklist, but simply a set of factors to be considered. But where analysis and methodology are based on "inherently subjective and speculative concept[s]" or where the methodology "cannot be tested, [] has no known rate of error, and [] is not subject to any particular standards or controls," the method cannot be evaluated and must be excluded. *24/7 Records v. Sony Music Entm't*, 514 F. Supp. 2d 571, 575 (S.D.N.Y. 2007).

The government has identified no facts, data, or principles whatsoever supporting

Mr. Dubowitz's proposed testimony, or any principles or methods underlying any opinion he

might give. That, standing alone, is sufficient to exclude his testimony. *See Hernandez v.*

*Leichliter*, No. 14-CV-550 (AJN), 2016 WL 684038 (S.D.N.Y. Feb. 18, 2016) (excluding

testimony because the proposed expert failed to cite any authority in support of his expert

opinions and appeared to have "simply copied and pasted most of his analysis here from a report

in an earlier case"); *see also Pfizer Secs. Litig.*, 819 F.3d at 662 ("If the opinion is based on data,

a methodology, or studies that are simply inadequate to support the conclusions reached,

*Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony.").

To the extent that the government relies on Mr. Dubowitz's C.V., the rules make clear

that "If the witness is relying solely or primarily on experience, then the witness must explain

how that experience leads to the conclusion reached, why that experience is a sufficient basis for

the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 adv.

comm. notes, 2000 amendment (noting also "The trial court's gatekeeping function requires more

than simply 'taking the expert's word for it.'"); *accord Highland Capital*, 379 F. Supp. 2d at 473

n.2 (quoting *Lippe v. Bairnco Corp.*, 288 B.R. 678, 686 (Bankr. S.D.N.Y. 2003)); *Berk v.*

*St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 354 (S.D.N.Y. 2005) ("An anecdotal

account of one expert's experience, however extensive or impressive the numbers it

encompasses, does not by itself equate to a methodology, let alone one generally accepted by the

relevant professional community."). The government has produced no such explanation.

**C.** **The Court Should Limit the Proposed Testimony From an OFAC Witness to Non-Expert Testimony Regarding the Existence or Non-Existence of Specific Licenses**

The government has not yet produced the proposed "opinions, the bases and reasons for those opinions, and the witness's qualifications" for its proposed OFAC expert. Rule 16(a)(1)(g). The OFAC witness should thus be excluded as an expert because the government has not carried its burden under Fed. R. Evid. 702. Moreover, each of the proposed topics of testimony would be unhelpful to the jury, either because they invade the province of the judge and jury instructions (first proposed topic, based on *Atilla* testimony), are irrelevant and prejudicial (third proposed topic) or because the relevant testimony would be fact testimony that calls for a fact witness, not an expert witness (second and fourth proposed topics).

**1.** **Qualifications in the proposed areas of expert testimony**

The government has not yet noticed a particular expert regarding OFAC. Sadr reserves the right to object if the expert is unqualified to offer opinions regarding one or more of the proposed areas of proposed expert testimony. *Compare* Sections IV.B.1-2, *supra*.

**2.** **The proposed expert testimony of an OFAC expert would not help the jury**

*a.* *Testimony describing the "nature of and authorities provided by statutes, executive orders, and regulations" would invade the province of the Court and therefore be unhelpful.*

The first topic the government lists for testimony by an OFAC representative is the "nature and authorities provided to OFAC by certain statutes, executive orders, and implementing regulations." Ex. 3 at 2-3. To the extent such testimony would briefly explain to the jury what the Iran Trade Sanctions Regulations are generally, and the nature of OFAC's responsibility to enforce them (for purpose of the conspiracy to defraud charged in Count One), such testimony would properly be fact testimony (from an OFAC official with appropriate

30

firsthand knowledge), not expert testimony. Such fact testimony would be very limited in scope, describing the subject area of the sanctions and OFAC's enforcement responsibility.

As an example of the testimony the it intends, however, the government attached a transcript of its OFAC representative's testimony in *Atilla*. That testimony—which walked through the specific regulations charged in the case, with the OFAC representative telling the jury what was prohibited under each one—is a very different matter. That testimony, purporting to tell the jury what was legal or illegal under the ITSR, amounted to legal instruction from the witness, and impermissibly usurped the role of the Court. Such testimony should be prohibited in this case.

The courtroom comes equipped with an expert on the applicable law: the judge. Expert testimony purporting to explain the applicable law to the jury is inadmissible because it invades the "exclusive province" of the judge and is therefore unhelpful. *Hygh v. Jacobs*, 961 F.2d 359, 364 (2d Cir. 1992) (noting that this extends to all expert testimony that "communicat[e]s a legal standard—explicit or implicit—to the jury"); *accord Marx & Co. v. Diners' Club*, 550 F.2d 505, 509-10 (2d Cir. 1977) ("[E]xpert testimony on law is excluded because 'the tribunal does not need the witness' judgment. . . . The special legal knowledge of the judge makes the witness' testimony superfluous.'" (quoting VII Wigmore on Evidence § 1952, at 81 (3d ed. 1940))). "To the extent [the expert] discusses governing law, the discussion is inadmissible because 'it is not for witnesses to instruct the jury as to applicable principles of law, but for the judge.'" *Highland Capital*, 379 F. Supp. 2d at 470 (quoting *Marx*, 550 F.2d at 509-10) (prohibiting an expert from testifying to the content of, interpreting, or explaining federal securities laws).

In *United States v. Banki*, it was the government who moved to preclude a proffered expert witness (the former director of OFAC) from testifying about the regulations enforced by

OFAC, because an expert "should not be instructing the jury on the law at all."  Gov't's Mot. to Preclude Certain Expert Test., *United States v. Banki*, No. 10-cr-08, Dkt. No. 52 (S.D.N.Y. Apr. 27, 2010).  The *Banki* court granted the motion to exclude, ruling the expert could not testify to his "construal of the law OFAC enforces."  *United States v. Banki*, No. 10-cr-08, 2010 WL 1875690, at *3 (S.D.N.Y. May 10, 2010) (reasoning that the expert's opinion on law "can have no bearing on any factual matter before the jury").

In *Atilla*, however, the government reversed course, noticing and calling an OFAC expert to testify about the "nature of authorities provided to OFAC" by different statutes, executive orders, and regulations.  Ex. 2.  Although several of those statutes were relevant to *Atilla* and irrelevant to the charges in this case—for example, the Weapons of Mass Destruction Proliferators Sanctions Regulations is not cited in the indictment or any briefs and has no alleged applicability to the charges here—the government's notice for its OFAC witness copies *Atilla* word for word,[19] stating the government's intent to elicit "similar testimony" against Sadr.  As an example of the testimony to be elicited, the government attaches the entirety of its OFAC witness testimony in *Atilla*, including her discussion of statutes, regulations, and blocked SDN entities that have nothing to do with the case against Sadr.  *See* 11/28/2017 Tr. at 101-04, *Atilla*, Dkt. No. 400; *see also* Section II, *supra* (discussing the stark differences between *Atilla*'s alleged actions to create a "slush fund" for the benefit of SDNs and the Government of Iran's activities, and Sadr's alleged actions for the benefit of a private company performing lawful third-country work in Venezuela).

In *Atilla*, the government elicited numerous impermissible descriptions of law and legal standards from its OFAC expert.  They included the expert witness telling the jury:

---

[19] *Compare* Ex. 2 *with* Ex. 3.

- the definition of "Government of Iran," Tr. at 101-02; *see* 31 C.F.R. § 560.303;

- that three entities at issue in *Atilla* were "part of the government of Iran for purposes of the sanctions," Tr. at 102;

- that "if you were to export services to Iran or the government of Iran, or where the benefit of services is otherwise received in Iran, any of those three would be a prohibited export of services," Tr. at 103; *see* 31 C.F.R. §§ 560.204, 560.410(a);

- that "the benefit of services performed anywhere in the world on behalf of the government of Iran is presumed to be received in Iran," Tr. at 103; *see* 31 C.F.R. § 560.410(d); and

- that "the [prohibition] on export of goods, technology, and services hit both direct and indirect. In other words, if someone else did the financial transaction on behalf of the government of Iran or an Iranian person, then they would – that would also be prohibited," Tr. at 104; *see* 31 C.F.R. § 560.204.[20]

To be clear: these regulations are the laws defining whether a crime was committed—whether Sadr's conduct violated the ITSR, and whether he willfully conspired to do so, or instead acted in good faith. These are matters for the Court to explain in instructions, not for a government witness to explain from the stand.[21]

---

[20] *But compare* Tr. at 104 (witness misstating that the transaction is prohibited if done on behalf of "an *Iranian person*") *with* 31 C.F.R. §560.304 (making clear that the prohibition applies only to persons in Iran "as defined in [§ 560.303]," *i.e.*, persons located in the *territory of Iran*) (emphasis added).

The OFAC witness continued to usurp the *Atilla* court's role, interpreting IEEPA executive orders and ITSR regulations at issue in that case that have no bearing here. *See, e.g.,* Tr. at 105 (stating that "any financial institution in Iran, any financial institution that's owned or controlled by such financial institution would all be considered Iranian financial institutions and blocked"; *id.* (stating that "an Iranian financial institution would [not] be able to conduct a financial transfer through the United States even before this executive order had been passed"; such a transfer "would be prohibited").

[21] It is no answer to complain that the regulations are unclear or not easily understood by the jurors without help. Those are matters for the Court's instruction. If the regulations are truly unclear, the answer is not purported clarification from a government witness, but application of the rule of lenity. *See United States v. Banki*, 685 F.3d 99, 109 (2d Cir. 2012).

*b.*     *Testimony about the SDN status of private companies other than*
        *Stratus or IIHCO is unhelpful and unfairly prejudicial*

The third topic listed for the government's proposed OFAC expert is the "identification

and/or designation of Iranian banks, companies, and government entities pursuant to various

OFAC authorities, including Eghtesad-e-Novin Bank and Oriental Oil Kish."  Ex. 3 at 3.  In

short, the government proposes to have an OFAC expert testify that Eghtesad Novin Bank and

Oriental Oil Kish, two companies in the Stratus Group, were designated as SDNs.  Such

testimony would be highly misleading and unfairly prejudicial—misleading the jury to believe

that the disputed payments in this case—made to IIHCO affiliates in Switzerland and Turkey

(Clarity and Stratus Turkey), which had nothing to do with either Eghtesad Novin Bank or

Oriental Oil Kish—benefitted the Government of Iran or Iranian terrorists.

During the *Atilla* trial, the government's OFAC expert testified that

> The Specially Designated Nationals and Blocked Persons list, or otherwise known
> as the SDN list, lists those individuals' property or interest in properties have been
> blocked by OFAC. In other words, sanctioned persons whose property has to be
> blocked by the U.S., for instance.  So, for example, on the SDN list there could be
> an individual or entity that's been sanctioned for proliferation of weapons of mass
> destruction . . . .

11/28/2017 Tr. at 97, *Atilla*, Dkt. No. 400; *see also id.* at 102 (noting that OFAC adds entities to

the SDN list if it determines they are "part of the government of Iran"); *id.* at 119 (testifying that

the oil company at the center of the allegations was added to the SDN list for serving as an agent

or affiliate of the IRGC).  The government proposes to have that expert "provide similar

testimony" in this case even though there is no allegation that any payment was made for the

benefit of Eghtesad Novin Bank or Oriental Oil Kish.  While SDN testimony may have been

relevant to a case that was about transactions on behalf of SDNs, it is irrelevant, misleading, and

unfairly prejudicial in this case and should be excluded.

34

This case is about the allegedly willful export of "financial services . . . **to IIHC** in Iran." Proposed Voir Dire (Dkt. No. 181) (agreed-upon Summary of the Allegations in This Case) (emphasis added). Neither Eghtesad Novin Bank nor Oriental Oil Kish allegedly received those services or was otherwise involved in their alleged exportation. The only reference to either company in the indictment is an aside that Stratus Group included Eghtesad Novin Bank, "which was the first private bank in Iran." Ind. ¶ 7. OFAC's designation of Eghtesad Novin Bank in 2012, *as part of its blanket designation of all banks in Iran*, has no bearing on the facts of this case or the allegedly unlawful exports to IIHC in Iran. Testimony about the designation of either Eghtesad Novin Bank or Oriental Oil Kish would be irrelevant and unhelpful to the jury in determining any fact in issue and inadmissible under Fed. R. Evid. 702.

Even if testimony about the designation of unrelated companies as SDNs had any probative value, it would be greatly outweighed by the unfair prejudice of such testimony, rendering the testimony inadmissible under Rules 403 and 703. *See, e.g.*, *Al-Moayad*, 545 F.3d at 166 (vacating convictions because even in a trial about material support for Hamas and Al-Qaeda, testimony about terror attacks with which defendants were not charged was too inflammatory to allow fair trial) (discussed in Section II, *supra*). Expert testimony linking Sadr to two SDN organizations, and through them to insinuated connections to terrorism—when the organizations are not the alleged beneficiaries of the services in this case and were not designated for any reasons specific to Stratus or Sadr—would distort the facts, inflame the jury's passions, and make a fair trial for Sadr nearly impossible. That unfair prejudice would be compounded by the confusion resulting from the significantly more stringent laws that apply to SDNs but not to private Iranian companies, which are not charged in the indictment and are

irrelevant to the case. The proposed testimony should be excluded because it would be unhelpful, misleading, confusing, and overwhelmingly unfairly prejudicial.

c. <em>Description of OFAC's licensing and enforcement authority does not involve expert testimony</em>

The second and fourth topics in the government's OFAC expert disclosure are "OFAC's licensing, designation, and enforcement authority," and "The existence and/or non-existence of licenses relating to certain counterparty entities or classes of transactions involved in this case." Ex. 3 at 3. These are appropriate subjects for fact, not expert, witness testimony.

As noted above (at 29, *supra*), testimony about OFAC's authority and responsibilities regarding the ITSR—which would include enforcement, licensing, and designation—should properly be given as fact testimony from an OFAC official with appropriate knowledge. Sadr has no objection to an OFAC representative providing a neutral description of how OFAC administers and enforces the Iran sanctions regime. That does not involve any opinion testimony and therefore does not require an expert.

"Under Daubert and Rule 702, expert testimony should be excluded if the witness is not actually applying expert methodology." *Dukagjini*, 326 F.3d at 54; *see Mejia*, 545 F.3d at 194 ("Testimony is properly characterized as 'expert' only if it concerns matters that the average juror is not capable of understanding on his or her own." (citing *United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994))). The Second Circuit has warned district courts that "[s]imply by qualifying an 'expert,' the witness attains unmerited credibility when testifying about factual matters . . . ." *Dukagjini*, 326 F.3d at 53. Because unmerited credibility is unnecessary here, it should not be conferred upon an OFAC official giving mere fact testimony about OFAC's authority and responsibilities.

36

Requiring that such testimony be factual, not expert, also would avoid the problem of such a witness purporting to interpret the regulations for the jury. As explained in Section IV.D.2, *supra*, such testimony would invade the province of the Court and should be prohibited. OFAC's testimony should be limited purely factual testimony.

### 3. The government has not carried its burden to prove that its proposed OFAC expert's opinions are (i) supported by sufficient facts or data and (ii) the product of reliable principles and methods

The government has not identified any facts, data, principles, or methods underlying data underlying the proposed OFAC witness's testimony. That alone is sufficient to preclude the witness from testifying as an expert. *See* Section IV.B.4, *supra*.

### D. The Court Should Exclude Expert Testimony From Bank Representatives, Allowing Only Percipient Fact Testimony Regarding the Practices of the Banks At Issue

With regard to its notice for one or more bank representatives, the government has not identified any witnesses, nor has it produced any proposed "witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." Fed. R. Crim. P. 16(a)(1)(g). Thus, although bank representatives may testify as fact witnesses, they should not be permitted to testify as experts because the government has failed to carry its burden under Rule 702. Moreover, expert testimony on each of the proposed topics would be unhelpful to the jury either because it would be irrelevant and prejudicial (the fourth topic) or because the relevant testimony would be fact testimony (the other five topics).

### 1. Qualifications in the proposed areas of expert testimony

The government has not yet noticed a particular expert regarding standard banking industry practices. Sadr reserves the right to object if the expert is unqualified to offer opinions regarding one or more of the proposed areas of expert testimony.

37

### 2. The proposed expert testimony of a bank industry expert would not help the jury

> *a.    The proposed bank industry expert's testimony regarding other people's methods of money laundering and sanctions evasion would not help the jury*

The fourth topic listed on the government's disclosure for a proposed bank expert is "[c]ommon methods of money laundering and sanctions evasion, such as wire stripping and lawyering." As set forth in Section III.B, *supra*, expert testimony about how other people have allegedly violated the sanctions or laundered money would be unfairly prejudicial, and would not help the jury because the conduct at issue is easy to understand.

> *b.    The proposed expert testimony regarding banking practices would not help the jury unless provided by a fact witness*

Expert testimony regarding the remaining topics regarding banking practices would be unhelpful to the jury because only the practices of the alleged victim banks (JPMorgan Chase and Citibank) are relevant. Fact testimony from witnesses at those banks regarding the maintenance of correspondent banking relations, operation of wire transfers, processing and settling foreign currency transfers, rejecting transactions, blocking transactions, cancelling transactions, and policies to combat money laundering and sanctions are potentially relevant, but each of those subjects is fact testimony based on the witnesses' firsthand knowledge, not expert testimony applying those witnesses' expertise to the facts of this case. Expert testimony about practices at other banks would not be helpful and instead would be potentially irrelevant, misleading, and confusing. In addition, as described in Section IV.C.2.c, *supra*, the Second Circuit has warned courts against qualifying a witness as an expert and conferring upon that witness "the aura of special reliability and trustworthiness" where expertise is unnecessary for the testimony. *Dukagjini*, 326 F.3d at 53.

### 3. The government has not carried its burden to prove that the proposed banking industry witness's opinions are (i) supported by sufficient facts or data and (ii) the product of reliable principles and methods

The government has not identified any facts or data underlying the proposed banking industry witness's testimony. Nor has the government identified the principles and methods underlying the proposed banking industry witness's testimony. That alone is sufficient to exclude the proposed expert testimony. *See* Section IV.B.4, *supra*.

## CONCLUSION

For the reasons set forth above, the Court should (1) exclude the government's proposed expert testimony because the government's late and incomplete notice violates the Discovery Order and Rule 16; (2) exclude proposed testimony about the Government of Iran's support for terrorism, nuclear proliferation, hostage-taking, declaration of "economic jihad," and similarly inflammatory topics; (3) prohibit the proposed use of experts as a vehicle for inadmissible hearsay; and (4) exclude any remaining proposed expert testimony because expert testimony on those topics would be unqualified, unhelpful, or unreliable.

Respectfully submitted,

*/s/ Brian M. Heberlig*
Reid H. Weingarten
STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, New York 10036
Tel: (212) 506-3900
Fax: (212) 506-3950
rweingarten@steptoe.com

Brian M. Heberlig (Pro Hac Vice)
Bruce C. Bishop (Pro Hac Vice)
David M. Fragale
Nicholas P. Silverman (Pro Hac Vice)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, DC 20036-1795
Tel: (202) 429-3000
Fax: (202) 429-3902
bheberlig@steptoe.com

*Counsel for Defendant*
*Ali Sadr Hashemi Nejad*

Dated: January 10, 2020