UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

United States of America,

—v—

Ali Sadr Hashemi Nejad,

Defendant.

18-cr-224 (AJN)

OPINION & ORDER

ALISON J. NATHAN, District Judge:

Federal prosecutors have constitutional and statutory duties to disclose many types of evidence to defendants. This principle of disclosure is central to our criminal-justice system. "A prosecutor that withholds evidence on demand of an accused which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant . . . That casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice." *Brady v. Maryland*, 373 U.S. 83, 87–88 (1963). And federal prosecutors, like all parties that appear before the Court, have ethical duties of candor. *United States v. Universita*, 298 F.2d 365, 367 (2d Cir. 1962) ("The prosecution has a special duty not to mislead; the government should, of course, never make affirmative statements contrary to what it knows to be the truth."). In the near decade the Undersigned has sat on the bench in the Southern District of New York, the vast majority of Assistant United States Attorneys before the Court have embraced their disclosure obligations, worked diligently to meet them, and forthrightly admitted when they did not.

But not all. In this case, federal prosecutors have by their own admission repeatedly violated their disclosure obligations and, at best, toed the line with respect to their duty of candor. Over the course of years in this prosecution—before, during, and after trial—the

1

Government has made countless belated disclosures of arguably (and, in one instance, admittedly) exculpatory evidence. For some pieces of evidence, the Government provides plausible explanations for its late disclosure. For others, it provides no explanation at all. And when the Court pressed for more information about one of these failures, the Government made a misrepresentation to the Court. This serious dereliction requires a serious response.

The story begins in 2018, with the Government's indictment of Mr. Sadr. After a two-week trial in March 2020, a jury found him guilty on five counts. But in part because of its disclosure failures, the Government later agreed that the Court should grant Mr. Sadr's motion for a new trial, vacate his guilty verdict, and dismiss the indictment against him with prejudice. The Court did just that, thus ending this criminal proceeding with respect to Mr. Sadr—but it is not the end of the matter. As this Court stated to the Government lawyers at trial and in several later orders, the serious and pervasive issues related to disclosure failures and misleading statements to the Court by at least one or more of the Government lawyers must be addressed separate and apart from the resolution of this case against Mr. Sadr. *See* Trial Tr. at 998:8–9; Dkt. Nos. 350, 357.

Consistent with that view, after dismissing the indictment, the Court pressed the Government for more information about its disclosure failures and misstatements. Unfortunately, the response from the United States Attorney's Office (USAO) for the Southern District of New York has been inadequate. To be clear, the Court does commend the USAO for admitting error and ultimately seeking to do justice in this case. But the dismissal of charges is not a basis for sweeping the Government's repeated failures under the rug. Nor does the dismissal of the indictment obviate the need for inquiry into whether the Government intentionally and in bad faith withheld exculpatory evidence or intentionally misled the Court.

The Court hoped that the Government's response would create a record sufficient to resolve these issues. Instead, the Government revealed an array of additional errors, including disclosure failures and new admissions of misconduct related to the Government's handling of search-warrant returns.

The Government also revealed new, highly problematic internal communications between the AUSAs who prosecuted this case. In particular, in the middle of trial, Government lawyers allegedly realized for the first time that they had not turned over a particular document to the defense. Instead of immediately disclosing that file, Government lawyers spent almost twenty hours strategizing how best to turn it over. One prosecutor suggested to another that they "bury" the evidence along with other, already-disclosed documents, and the second prosecutor agreed. And after looping in more prosecutors, the Government did just that, obfuscating its disclosure. The Government now admits that this document had exculpatory value for Mr. Sadr. Disappointingly, the leadership of the USAO has failed to unequivocally condemn these prosecutors' improper actions and communications, and the Court has not been ensured that an investigation by the Department of Justice's Office of Professional Responsibility will take place. A further response is therefore required from the Court.

Such a response includes making a clear record of the Government's failures in this case in an effort to prevent these issues from reoccurring. The Court thus begins by recounting the factual and procedural background of this prosecution. The Court then details the Government's many search-warrant and disclosure-related failures and urges structural solutions. This factual recitation is based on information provided by the Government. The Court then narrows its focus to a single piece of evidence disclosed mid-trial, and concludes that the Government both violated its disclosure obligations and subsequently made a misrepresentation to the Court about

its conduct.  The Court finally orders additional fact-finding and briefing to determine whether any of the Government lawyers in this case either intentionally withheld exculpatory evidence or intentionally misled the Court about one of the late disclosures.

Government lawyers wield enormous prosecutorial power.  They must exercise it in a way that is fully consistent with their constitutional and ethical obligations.  And it is the obligation of the courts to ensure that they do and hold them accountable if they do not.

## I.      DISCLOSURE AND SUPPRESSION FAILURES RESULT IN DISMISSAL OF THE INDICTMENT

In March 2018, the Government charged Mr. Sadr with conspiracy to defraud the United States, conspiracy to violate the International Emergency Economic Powers Act, bank fraud, bank-fraud conspiracy, money laundering, and money-laundering conspiracy. Dkt. No. 2.  Over one year later, this case was transferred to the Undersigned.  This Court presided over extensive pretrial litigation—including suppression litigation—after which Mr. Sadr's case proceeded to trial.  *See* Dkt. Nos. 164, 197.  The Court held a two-week trial in early March 2020, during which the jury continued to serve diligently despite the onset of the COVID-19 pandemic in New York City.  On March 16, 2020, the jury convicted Mr. Sadr on five counts, finding him guilty on all but the money-laundering-conspiracy charge.  *See* Dkt. No. 310.  The Government asked that Mr. Sadr immediately be taken into federal custody, but the Court denied this request.  *See* Trial Tr. at 2129:1–10.

After the trial, Mr. Sadr moved for acquittal as a matter of law or, in the alternative, for a new trial.  Dkt. No. 335.  Although the Court was assured in March that the disclosure issues in this case were being raised at the "level of the U.S. Attorney," Trial Tr. at 996:6–10, it was apparently not until the end of May 2020 that the USAO's Criminal Discovery Coordinator and Professional Responsibility Officer "began" looking into disclosure issues in this case.  Dkt. No.

352 at 1. As a result of this inquiry—and while Mr. Sadr's motion remained pending—the Government determined that it would not be in the "interests of justice" to further prosecute this case. Dkt. Nos. 348, 348-1. It thus took the extraordinary step of asking the Court to enter an order of *nolle prosequi* as to the indictments filed against both Mr. Sadr and his co-defendant Bahram Karimi. *Id.*

While Mr. Sadr agreed that the indictment against him should be dismissed with prejudice, he disagreed with the Government's proposed procedural mechanism for dismissal. *See* Dkt. Nos. 349. The Government eventually acceded to Mr. Sadr's request that the verdict be vacated and a new trial be granted under Federal Rule of Criminal Procedure 33(a), and that the indictment subsequently be dismissed with prejudice under Rule 48(a). *See* Dkt. Nos. 360, 361. On July 17, 2020, the Court therefore granted Mr. Sadr's motion for a new trial, vacated the verdict against him, and dismissed the indictment with prejudice. *See* Dkt. No. 362. The Court's July 17 Order referenced the Government's explicit acknowledgement of the "disclosure-related issues that arose during the March 2020 trial as well as in pre- and post-trial motion practice, including with respect to pretrial suppression litigation." *See id.* (quoting Dkt. No. 348).

As noted, the Court commends the USAO's admission of error and effort to do justice in this case by agreeing to dismiss the indictment. Better late than never. Still, that dismissal cannot be a basis for failing to grapple fully with the Government's many errors in this prosecution.

## II.     THE EXISTING RECORD EXPOSES SIGNIFICANT ERRORS

Before granting Mr. Sadr's motion for a new trial and vacating his conviction, the Court ordered the Government to respond to a series of questions addressing disclosure-related issues and any associated misrepresentations or misstatements made to the Court. *See* Dkt. No. 350. The Government's responses not only detailed issues already familiar to the Court, but they also

raised—for the first time, over two years after this case was charged and over two months after a jury found Mr. Sadr guilty on five counts—a slew of search-warrant-related issues implicating the Fourth Amendment. Several of these issues, both new and old, suggest patterns that may extend beyond this case and require systemic solutions.

### A.    Suppression Issues

The Court begins briefly with suppression issues raised by the Government for the first time in its July 2, 2020 letter. *See* Dkt. No. 354. To understand these issues, some background is helpful: The Manhattan District Attorney's Office (DANY) investigated this matter for state-law crimes before referring the case to the USAO. During its state-law investigation, DANY executed search warrants of various email accounts, including Mr. Sadr's personal email accounts. *See, e.g.*, Dkt. No. 96-1. The affidavit in support of one warrant cited "reasonable cause to believe that evidence of the crimes of Money Laundering [under New York State Law,] as well as attempt and conspiracy to commit said crimes, may be found" in these email accounts. *Id.* at 3–4. And the warrant authorized "members of the New York County District Attorney's Office" to seize and search these documents. *Id.* at 38–39. Some of those emails were later turned over to the USAO, and the Government viewed their content as "particularly incriminating and pertinent." Dkt. No. 147-3. Mr. Sadr however argued in his pretrial motions that much of this evidence should be suppressed. The Court only partially granted his request, rejected most of Mr. Sadr's arguments, and allowed the Government to rely upon thousands of pages of seized documents. *See United States v. Sadr*, 436 F. Supp. 3d 707, 736–38 (S.D.N.Y. 2020).

During this extensive pretrial suppression litigation, Government lawyers consistently argued that DANY searched those state email search-warrant returns for material pertinent to violations of state law alleged in those warrants. Dkt. No. 354 at 16. In September 2019, the

Government specifically represented to Mr. Sadr "that the email search warrant returns had been reviewed by DANY personnel and that after the DANY review had ended . . . , 'hot docs' were provided to the U.S. Attorney's Office." *See id.*; *see also* Dkt. No. 147-3.  But over six years after the first of these state email search warrants was issued, the Government now informs the Court—and Mr. Sadr—that in fact federal investigators were mining the state search-warrant returns for federal crimes without authorization of a warrant.  Dkt. No. 354 at 6, 16.  The Government confesses that "early on in the DANY investigation, the FBI had had DANY personnel search email data in general support of at least one witness interview, and that the FBI *was investigating federal crimes rather than the state-law offenses at issue in the warrants, contrary to arguments [the Government] made during suppression litigation.*"  Dkt. No. 354 at 6 (emphasis added).  The Government further acknowledges "that the FBI was seeking to use material gathered in response to the state email search warrants in aid of FBI interviews, and to further investigation of federal charges."  *Id.* at 7.  This conduct was likely unconstitutional because review of search-warrant returns must be done in conformity with the warrants themselves.  *See generally United States v. Matias*, 836 F.2d 744, 747 (2d Cir. 1988) ("A search must be confined to the terms and limitations of the warrant authorizing it.").  Moreover, the Government now admits that a central premise of its pretrial arguments opposing Mr. Sadr's suppression motion was directly contrary to what actually occurred during the investigation of this case.

The Court cannot state with certainty the outcome of the pretrial suppression litigation had these additional search-warrant-related issues come to light earlier.  But it is certainly possible, as Mr. Sadr argues, that had the Government "disclosed the true facts [regarding the execution of the state email search warrants] to [him], the email evidence would have been

suppressed, and the trial would have been avoided altogether." Dkt. No. 355 at 5. Indeed, one of the Government's arguments in seeking dismissal of the indictment against Mr. Sadr's co-defendant Bahram Karimi, who was not tried (and thus not prejudiced by the late disclosure issues discussed extensively below), is that the discovery of the FBI's involvement in DANY's investigation creates a "substantial risk that essential email evidence would be suppressed." Dkt. No. 354 at 7. What is clear, however, from the Government's belated revelations is that the USAO for SDNY specifically, and the Department of Justice more broadly, must implement policy and training procedures that instill in FBI agents the permissible limits of searching electronic warrant returns in a way that conforms to constitutional requirements. Moreover, AUSAs must be trained to conduct proper due diligence about the conduct of investigating agents *before* making misleading representations to the Court about that conduct. *See, e.g.*, Dkt. No. 155 at 3–4 (describing searches of state email search-warrant returns from April 2014 to April 2017, but nowhere mentioning FBI investigation of federal crimes during this period). And if any of the Government lawyers made (or allowed others to make) knowing misrepresentations to the Court in opposing the motion to suppress, as Mr. Sadr argues likely occurred, Dkt. No. 355, their conduct would constitute an egregious ethical violation.

In light of the dismissal of the indictments here, there will be no further litigation of these issues before the Court. Accordingly, it is the view of the Court that the suppression issues belatedly revealed by the Government in its July 2 letter, Dkt. No. 354, ought to be the subject of a referral to the Department of Justice's Office of Professional Responsibility for a full investigation.

## B. Disclosure Issues

The Court next turns to the numerous disclosure-related issues that arose prior to, during, and after Mr. Sadr's trial. Disclosure-related issues first arose shortly after this case was

transferred to the Undersigned and have—disturbingly—continued unabated since. The Court and Mr. Sadr were made aware of the first of these issues in a conference held on September 9, 2019. At that conference, the Government revealed to Mr. Sadr for the first time information it had learned back in May 2019—namely, that "there were custodians searched and documents seized . . . that were not produced in [the] initial Rule 16 discovery." Dkt. No. 137 at 35:5–7. At that point in time, Mr. Sadr believed—based on representations made by the Government—that Rule 16 discovery had been closed for over a year. *See id.* at 40:11–19. The Government did not uncover these discovery-related issues until new prosecutors came into the case in the spring and summer of 2019 and, "in the process of attempting to understand the case," asked questions of former prosecutors regarding the production of documents to the defense. *See id.* at 35:14–22. As a result of the Government's failure to timely comply with its discovery obligations, it agreed not to rely on any of the untimely produced documents at trial. *See* Dkt. No. 155 at 11; Dkt. No. 173 at 38:24–39:4.

The next disclosure-related issue arose during trial, shortly before the Government rested. Though the Court discusses issues surrounding Government Exhibit (GX) 411 in greater detail below, *see* Section III, it mentions the Government's failure to timely disclose this exhibit here to situate it within the larger pattern of the Government's failure to satisfy its disclosure obligations under the Constitution and the Federal Rules of Criminal Procedure. GX 411 is a letter sent by Commerzbank to the Office of Foreign Assets Control (OFAC) flagging the first payment charged in this case. *See* Dkt. No. 274-1. The failure to timely disclose this exhibit precipitated a cascade of failures to timely disclose related materials—including materials from DANY's and the USAO's earlier investigations of Commerzbank and communications with OFAC—some of which were not disclosed until after the trial in this case had concluded. *See*

Dkt. No. 354 at 3, 8–9.

The belated disclosures did not stop there. The Government disclosed several additional possibly exculpatory documents *after* the trial in this case ended. Perhaps the most egregious of these relate to two interviews of Mr. Sadr's co-defendant, Mr. Karimi. First, a recording was made by Canadian authorities of a January 22, 2020 interview with Mr. Karimi. *See* Dkt. No. 307-1 at 2. On February 3, 2020, after Mr. Karimi's public indictment, counsel for Mr. Sadr requested Mr. Karimi's witness statements. *See id.* at 3. On February 11, 2020, the FBI New York office received a recording of the January 22, 2020 interview of Mr. Karimi. *See id.* at 4. By the next week, the FBI special agents were aware that the FBI was in possession of the recording—but they did not inform the prosecutors of this fact. *See id.* Due to communication breakdowns between the prosecutors and the FBI, the prosecutors informed Mr. Sadr on two separate occasions—first on February 23, 2020, and again on March 10, 2020—that the FBI had requested but not yet received the recording from Canadian authorities. *See id.* at 5. After trial ended, an AUSA followed up with the FBI and learned that the recording *had been in the FBI's possession since before the trial had started*. *See id.* at 5–6. The Government finally produced the recording to Mr. Sadr on March 31, 2020, over two weeks after Mr. Sadr's trial had ended. *See id.* at 6.

Second, a classified FD-1057 report was created from an interview with Mr. Karimi on September 14, 2016. *See* Dkt. No. 354 at 5. Yet despite multiple communications with the FBI, beginning in 2017, regarding discoverable information, the prosecutors on this case did not learn of the FD-1057 Karimi report until an AUSA conducted an "on-site personal review of the FBI case file" in *mid-May 2020*, two months after trial. *Id.* As a result, this report was not declassified and disclosed to Mr. Sadr until May 19, 2020. *Id.* The Government attributes the

failure to timely disclose this report, as well as the recording discussed above, to breakdowns in communication between prosecutors and the FBI. Troublingly, the Government makes little effort to explain in detail *why* or *how* these communication breakdowns came to pass, or *why* the prosecutors—well aware of their constitutional and statutory obligations—were not more diligent in communicating with the FBI.

The final category of disclosures made after trial consists of three FBI interview reports (FD-302s) of interviews with Victor Aular, the former CFO and Director of a Venezuelan state-owned oil company, that took place in early 2016. *See* Dkt. No. 354 at 3–4. The parties dispute whether these interviews constitute *Brady* material that the Government was required to disclose. *Compare* Dkt. No. 354 at 3–4 *with* Dkt. No. 355 at 4. But the Government concedes that "even if not required to be disclosed, the Aular 302s *should have been* disclosed ahead of trial as a matter of good practice so that potential defense theories about Sadr's state of mind . . . and the admissibility of Aular's statements, could have been developed and addressed in an orderly fashion in limine." Dkt. No. 354 at 4 (emphasis added). Setting aside whether these interview reports constitute *Brady* material, the Government's handling of them reveals failures in its treatment of potentially exculpatory material. Specifically, at the end of January 2020, the prosecutors discussed whether they were required to disclose the Aular 302s under *Brady*. One prosecutor suggested that it "could be worth running [the question] by a chief," but the AUSAs inexplicably "*did not further pursue the question*" and did not ultimately disclose the interview reports to Mr. Sadr pre-trial. *See id.* (emphasis added). Especially in light of the trial blinders that prevented it from timely disclosing conceded *Brady* material to Mr. Sadr, *see* Section III, the Government's failure to further pursue the question of whether the Aular 302s were required to be disclosed under *Brady* is shocking. And even if the Government had considered the *Brady*

question and concluded that the Aular 302s did not constitute *Brady* material, the Court agrees

that the 302s should nonetheless have been disclosed in advance of trial as a matter of good

practice. *See Cone v. Bell*, 556 U.S. 449, 470 n.15 (2009) (noting that a prosecutor's ethical

"obligation to disclose evidence favorable to the defense" may be broader than constitutional or

statutory duties) (citing ABA Model Rule of Professional Conduct 3.8(d)). Better training and

an expansive approach to the Government's discovery obligations would help ensure that, in the

future, "trial blinders" do not cause AUSAs to wrongfully withhold potentially exculpatory

evidence.

The Court turns finally to the Government's complete failure to produce certain classified

material at any point—either before, during, or after trial. During its post-trial review, the

Government discovered additional classified material subject to Rule 16 disclosure that was

never declassified and disclosed to Mr. Sadr. *See* Dkt. No. 354 at 5. It does not explain why this

material was discovered only after trial, and it maintains that, following its application for an

order of *nolle prosequi*, the components of the United States Government involved in the

handling of classified information would have been unlikely to authorize use of the information.

*See id.* As a result, this classified material has never been disclosed to Mr. Sadr.

C.     **These Issues Call for Systemic Solutions**

Having set forth several of the suppression and disclosure-related issues that plagued the

prosecution in this case, the Court notes some common themes that have emerged. The issues

discussed above appear to have been precipitated by one or a number of the following factors:

1. The sheer number of prosecutors who worked on this case (fourteen total—seven line prosecutors, one Special Assistant United States Attorney (SAUSA), and six supervisors, *see* Dkt. No. 354 at 1–2);

2. The frequency with which different prosecutors subbed into and out of the case, *see id.*;

3. The number of AUSAs on the trial team (this case was tried by four Government lawyers);

4. A failure to coordinate and effectively communicate with the Manhattan District Attorney's Office;

5. Failures to communicate between the AUSAs and the Special Assistant United States Attorney appointed from DANY;

6. Breakdowns in communication between the FBI and line prosecutors, including regarding the FBI's investigation of this case;

7. Insufficient training of FBI agents and AUSAs on appropriate limits to searches of electronic search-warrant returns;

8. Insufficient training for all participating AUSAs and the SAUSA on disclosure obligations;

9. Insufficient policies in place that ensure timely and complete compliance with disclosure obligations; *and*

10. Insufficient supervision of disclosure obligations by the USAO's Unit Chiefs.

It is possible that the issues articulated above, as well as the precipitating factors the Court identifies, are not unique to this case. Indeed, in the last criminal case tried before the Undersigned, the Government also seriously breached its *Brady* obligations. *See United States v. Robert Pizarro*, No. 17-cr-151 (AJN). Following that revelation, the Court was repeatedly assured by the leadership of the USAO that the matter was being taken seriously, would be systemically addressed through training, and would not reoccur. No. 17-cr-151 (AJN), Dkt. No. 135 at 8:11–10:10, 58:2–15. The record before the Court in this case belies those assurances.

It is impossible for the Undersigned alone to address and resolve these issues. Here too, it is thus the Court's view that these errors should be investigated by DOJ's Office of Professional Responsibility. Moreover, the manifold problems that have arisen throughout this prosecution—and that may well have gone undetected in countless others—cry out for a *coordinated*, *systemic* response from the highest levels of leadership within the United States Attorney's Office for the Southern District of New York. The Court implores the Acting United

States Attorney to take seriously the numerous deficiencies set out in detail above and to take action to ensure future prosecutions brought under the aegis of her office do not suffer from the same.  In that regard, the Court will prescribe her first order of business: the Acting United States Attorney shall ensure that all current AUSAs and Special AUSAs read this Opinion.

## III.    THE GOVERNMENT'S FAILURE TO DISCLOSE EXHIBIT 411

The Court next turns to a narrower set of concerns related to Government Exhibit 411.  The Court concludes that the Government failed to satisfy its disclosure obligations with respect to this exhibit and then made a misrepresentation to the Court about its conduct.  Unfortunately, following the Government's July 2 letter, there remain several significant open questions regarding the Government's conduct that this Court is obligated to resolve.  As explained below, further fact-finding by the Court is necessary.

### A.    The Government Admits GX 411 is Exculpatory

Before diving into the Government's failure to timely disclose GX 411, it is helpful to catalogue the contents of this document and explain why the Government now concedes that it has exculpatory value for Mr. Sadr.

The document that came to be known as Government Exhibit 411 is a 2011 letter from the New York branch of Commerzbank, a German financial institution, to the Treasury Department's Office of Foreign Assets Control.  *See* Dkt. No. 274-1 (GX 411).  In this letter, Commerzbank's New York branch informs OFAC of an approximately $30 million payment from a Venezuelan entity to Stratus International Contracting Company.  As noted, this payment is the first payment charged in this case.  The letter further provides information about Stratus and notes that the "purpose of the payment is for the construction of a 7000 apartment unit project" in Venezuela.  *Id.*  The letter goes on to say that "Although Stratus is not listed as an SDN [Specially Designated National], and the payment does not indicate any direct involvement

14

of Iran or with Iran, due to conflicting information between [Stratus's] website and the response forwarded by the [Venezuelan bank], [Commerzbank] believes it appropriate to share this information with OFAC since Stratus may be an Iranian Company." *Id.* The letter concludes by noting that Commerzbank had added Stratus "into [its] sanctions filter to monitor any future payments," that Commerzbank had not processed any other transactions involving Stratus, and that this information was being provided to OFAC in hopes of complying with Commerzbank's sanctions-related reporting requirements. *Id.*

The Government maintains that for years it viewed the letter as wholly inculpatory. Specifically, the Government argues that GX 411 was "helpful [to its case-in-chief] because it showed that the information the defendant was trying to hide from the bank was material to the bank, which wouldn't have processed the transaction if it knew it was connected to Iran, and that the bank put the name of the company on its sanctions filter." Dkt. No. 354 at 11; *see also* Trial Tr. at 986:7–16 (The Court: "In the course of this discussion was there any notion as to [GX 411's] potential use to the defense case, having yourselves sat through a week of trial, heard rulings on objections, heard the defendant's opening, in any of that discussion, right at the moment you're talking about, is there the thought: Whether we want to use this or not, it needs to be turned over?" The Government: "Candidly, your Honor, no, there was not that discussion. The discussion was solely about how inculpatory the government viewed the document.").

Mr. Sadr, however, contends that the letter is exculpatory for a slew of reasons. *See* Dkt. No. 274 at 1–2; Dkt. No. 336 at 70–77. To take just a few of Mr. Sadr's explanations of the letter's clear exculpatory value, he argues that GX 411 shows that the affiliation between the recipient of the payment—Stratus International Contracting, a Turkish company—and Stratus Group, an Iranian conglomerate, was immaterial to OFAC. *See* Dkt. No. 274 at 1–2. Indeed, he

points out that this affiliation was ultimately not enough for OFAC to stop U.S. dollar payments to Stratus International Contracting. *Id.* at 2. This point undermines several counts of the indictment, including at least the *Klein* conspiracy alleged in Count One and the bank fraud "right to control" charges alleged in Counts Three and Four. Each of these counts is predicated on the prospect of OFAC enforcement—and associated penalties levied on the intermediary banks—had OFAC known of Stratus International Contracting's Iranian connections. *See United States v. Ballistrea*, 101 F.3d 827, 831 (2d Cir. 1996) (holding that a *Klein* conspiracy requires a "purpose of *impairing, obstructing, or defeating the lawful function*" of OFAC (citation omitted)); *United States v. Finazzo*, 850 F.3d 94, 111 (2d Cir. 2017) (holding that "misrepresentations or non-disclosure of information cannot support a conviction under the 'right to control' theory [of bank fraud] unless those misrepresentations or non-disclosures can or do result in tangible economic harm" to the banks at issue). But as GX 411 and related disclosures demonstrate, when OFAC was apprised by Commerzbank of this very fact, it took *no* enforcement action.

Mr. Sadr also contends that this letter undermines an argument that was central to the Government's trial theory: that Mr. Sadr structured the charged transactions to conceal connections to Iran. To the contrary, he claims that GX 411 demonstrates that the affiliation between Stratus International Contracting and Stratus Group was readily identifiable—so readily identifiable that it was discovered when the *first* charged payment was processed. *See* Dkt. No. 336 at 74. For these reasons, Mr. Sadr's attorneys stress that if GX 411 had been timely disclosed, their pre-trial investigation, theory of the case, opening and closing statements to the jury, evidentiary submissions, and cross examination of a Government witness all would have materially differed. Dkt. No. 336 at 74–75; Trial Tr. 999:8–18.

The Government has now come around to Mr. Sadr's position and concedes that GX 411 has exculpatory value. *See* Dkt. No. 275 at 2; Dkt. No. 354 at 8; Trial Tr. at 1005:5–6. In the Government's own words, GX 411 is exculpatory because it "advances the defendant's claim that any decision by OFAC not to take enforcement action following this disclosure is probative of the risk of harm from OFAC enforcement that banks face when they process transactions in violation of the sanctions law." Dkt. No. 275 at 2. The Government has thus "concede[d] that it erroneously failed to timely disclose the document at issue, and apologize[d] to the Court and counsel for its error." *Id.* at 1.

### B. The Government Has Possessed GX 411 Since 2015

Even accepting the Government's contention that it did not appreciate the letter's exculpatory value does not change the fact that government actors knowingly possessed GX 411 for almost a decade. In January 2011, a slew of federal and state actors—Main Justice, the United States Attorney's Office for the Southern District of New York, OFAC, the Federal Reserve's Board of Governors, and the New York County District Attorney's Office—began investigating Commerzbank for violating U.S. sanctions. Dkt. No. 283 at 2; *see also* Dkt. No. 354 at 8. During these parallel investigations, Commerzbank's New York City branch provided the District Attorney's office various voluntary disclosures, one of which was GX 411. Dkt. No. 283 at 2–3. And about a year into these investigations, an Assistant District Attorney (ADA) was assigned to the District Attorney's investigation. (That ADA would later be appointed a Special Assistant United States Attorney in this case.) In March 2015, Commerzbank resolved these investigations by entering into a universal deferred prosecution agreement. *Id.* at 3; *see also* Dkt. No. 354 at 8.

Two months later, the ADA was assigned to work on the District Attorney's investigation of the "Venezuela housing matter, which ultimately led to this case." Dkt. No. 354 at 9. At

around the same time, the ADA was "boxing up material from the Commerzbank investigation that had [recently] ended." *Id.* In doing so, he "came across some documents (including or consisting of [GX 411]) that he realized related to the [investigation of Mr. Sadr.]" *Id.*; *see also* Dkt. No. 283 at 3. At that time, the ADA "set those documents aside in a hard-copy manila folder." Dkt. No. 354 at 9. These documents then lay dormant for years, somewhere in the ADA's office.

In August 2015, "[the ADA] issued a state grand jury subpoena" to Commerzbank's New York branch in connection with the District Attorney's investigation of Mr. Sadr, and the branch duly responded to that request with many documents. Dkt. No. 354 at 9; Dkt. No. 283 at 3. The parties refer to this as the "Commerzbank Subpoena Production." Dkt. No. 283 at 3. The Government produced this entire Subpoena Production to Mr. Sadr during Rule 16 discovery in this case. *Id.*; *see also* Trial Tr. 988:14–25. But there's a catch: GX 411 was *not* part of the Commerzbank Subpoena Production in this matter, so it was not produced to the defense along with these documents. GX 411 had only been turned over to the Government in the earlier and unrelated investigation of Commerzbank, and the letter remained in that manila folder on the ADA's desk for years. By the time of the Commerzbank Subpoena Production in connection with this case, GX 411's contents were, according to the Government, "lost to [the ADA's] memory." Dkt. No. 354 at 9.

Fast forward four years, to late 2019. By this point, the United States Attorney's Office had indicted Mr. Sadr, and attorneys on both sides were gearing up for trial. Around this time, the ADA, who was now an SAUSA, "rediscovered" the hard copy of GX 411 in his office. The Government has made two different representations about how this rediscovery came to pass. First, in its March 9 letter, the Government stated that on January 10, 2020, "AUSA[-1] sent an

email to [the SAUSA] . . . mention[ing] the April 4, 2011 wire transfer from Fondo Cino to Stratus International Contracting J.S. for $29 million, which is described in GX 411." Dkt. No. 283 at 4. AUSA-1 "stated a document previously provided by a witness—which was produced to the defense during Rule 16 discovery—'should be helpful in tying the wire information we have showing the Fondo Chino transfer to PDVSA.'" *Id.* Her email "triggered for [the SAUSA] a recollection of GX 411." *Id.* "That same day, [the SAUSA] located GX 411 in a hard copy file at his DANY office; [the SAUSA] had segregated [GX 411] from Commerzbank's other voluntary disclosures and stored it in the folder, but does not recall when he did so." *Id.* at 4–5. The SAUSA then emailed the prosecution team, attached GX 411, and said, "In the spirit of closing the loop on the $29M payment through Commerz, attached is the voluntary disclosure Commerze (sic) made to OFAC re: the payment." *Id.* at 5.

But in its July 2 letter, the Government puts forward a different story regarding this rediscovery. This one begins a month earlier: In December 2019, the SAUSA was "making a pre-trial sweep through his office for everything[, and] he rediscovered the separate folder of Commerzbank-Sadr documents." Dkt. No. 354 at 9. The target of the SAUSA's purported pre-trial sweep—"everything"—is vague and unclear. The SAUSA then referenced GX 411 in a December 19 email, three weeks before the January 10 email discussed above. In that December 19 email to the prosecution team, the SAUSA made the following comment, purportedly relating to GX 411: "Now I'm really going off on a tangent, but Commerzbank was an intermediary bank in the first USD payment (to Stratus Turkey) and they actually picked up on 'Stratus' in the payment message, drew the connection to the Iranian entity, and filed a report with OFAC." *Id.* Yet the SAUSA did not attach GX 411 to the December 19 email. He only shared the document with the team three weeks later, in his January 10 email discussed above. In short, the

Government has presented two different versions of events. In one, an email from a colleague "triggered" the SAUSA's memory of GX 411 in January 2020. In the other, the SAUSA was conducting a "pre-trial sweep" of his office, stumbled upon GX 411 in December 2019, and referenced GX 411 in an email that same month.

Whichever is true, here's the nub: On January 10, 2020, every prosecutor active in the case received an email with GX 411. But even on that late date—months after *Brady* and Rule 16 disclosures had been made and two months before trial—no attorney disclosed GX 411 to the defense. The Government proffers that the prosecution team made a "reasonable assumption . . . that all Commerzbank documents had previously been disclosed" through the Commerzbank Subpoena Production. *Id.* at 10. Of course, recall that GX 411 was not part of that Subpoena Production, but instead came from the earlier, non-Sadr-related investigation of Commerzbank. The Court agrees that this is a plausible explanation for why at least some of the prosecutors thought that GX 411 had already been disclosed and thus took no further action in January. From their perspective, nothing in GX 411 distinguished it from the many other documents from Commerzbank that the Government had duly disclosed. Still, it is harder to accept how the SAUSA, who was fully aware of (and indeed had worked on) the separate, non-Sadr related investigation of Commerzbank and who had himself possessed GX 411 as a result of that investigation since 2015, could have assumed throughout that GX 411 had been produced to the defense. And to be clear, he was appointed as an SAUSA in this matter effective June 2017. *Id.* at 2 n.2. As the Government recognizes, "when an attorney from another agency is appointed a SAUSA to assist this Office in a criminal case, it is this Office, and our AUSAs, who are ultimately responsible for disclosures in the case, and knowledge of any matter in the investigation that may be overlooked by a SAUSA is imputed to the Government, whether or not

the AUSAs on a case have actual knowledge of the matter." *Id.* The Government had therefore possessed GX 411 since the day Mr. Sadr was indicted—yet did not disclose the document for *more than two years*, in the midst of trial. Once again, the Government's explanation that it thought the document had been produced to the defense as part of the Commerzbank subpoena production is plausible, but the Court has lingering doubts based on matters discussed below.

### C. Government Prosecutors Discuss "Burying" GX 411

Now jump forward another two months, to March 6, 2020. By this point, trial has begun. Around 8 P.M. on that Friday evening, after trial had concluded for the day, AUSA-1 was, according to the Government, "organizing her emails" and stumbled upon the SAUSA's January 10 email attaching what would later be marked as GX 411. Dkt. No. 283 at 5; Dkt. No. 354 at 10. In an email to her colleagues, she wrote, "Given what defense did today, I think [the exhibit that would later be marked as GX 411] could be really valuable to put in. Among other difficulties with doing that is the fact that I don't know that it was ever produced to defense (it's not in the Commerzbank subpoena production). [SAUSA] – do you know where it came from?" Dkt. No. 354 at 10.

But AUSA-1 was unable to get in touch with the SAUSA, so she instead spoke with AUSA-2, another prosecutor on the case. In a chat message, AUSA-1 wrote, "[I] feel like it might be too late to do anything about it, but [I] can't believe we all missed that [C]ommerzbank document," adding "[I] have no idea where that letter came from[;] [I] don't think it has ever been produced to the defense." *Id.* AUSA-2 replied, "[O]h, that letter[;] we can produce it tonight[;] produce it right now and the defense can have 3 days to review[;] that's more than enough time for one document[;] mark and produce it stat—[I] think we should at least try." *Id.* Astonishingly, AUSA-1 responded, "[I]'m wondering if we should wait until tomorrow and ~~bury it in some other documents~~." *Id.* (emphasis added). In response to AUSA-1's proposal to "bury"

GX 411, AUSA-2 agreed and took the plan further by proposing documents along which GX-411 could be buried when disclosing it to the defense. *Id.* at 11. Specifically, she replied, "that's fine too—some of the [Financial Action Task Force] stuff," referring to another exhibit. *Id.* Later in that chat, AUSA-1 noted that the Government "need[ed] to come up with some explanation for why the defense is just seeing this for the first time . . . ." *Id.* at 11. According to their own internal communications, therefore, on the evening of March 6, the prosecutors in this case again came across GX 411, recognized somehow for the first time that it had never been disclosed to the defense, recognized that its lack of disclosure would likely draw objection, strategized how to "bury" the document, settled on a plan to do so, and discussed waiting an additional day before turning it over to aid in burying the document among others.

Even the next day, disclosure was not immediately forthcoming. Instead, on the morning of Saturday, March 7, the Government admits that several members of the prosecution team discussed GX 411 and debated how and even whether the exhibit should be disclosed. *Id.* at 11. At this time—in the midst of trial—the Government represents that "there was never any notion [among the AUSAs] that GX 411 might be of exculpatory value to the defense." *Id.* On that morning, "AUSAs discussed . . . [w]hether the exhibit was worth offering." *Id.* According to the Government's own theory, if prosecutors believed that the document was wholly inculpatory and decided not to offer it at trial, they likely would have never turned it over to the defense. Indeed, AUSA-1 "did not want to get into a fight with defense counsel over the document," and she "recalls a discussion" amongst the prosecutors that its lack of disclosure may not violate Federal Rule of Criminal Procedure 16. *Id.* There were thus some members of the prosecution team who, even after recognizing that the document had not been disclosed, argued that the Government should not turn it over.

### D.    The Government Discloses GX 411

At around 4 P.M. on Saturday, March 7, the Government disclosed GX 411.  It did so in an email sent from AUSA-1 to the defense team.  Dkt. No. 354 at 12–13.  The specifics of this transmittal email are critical, so the Court attaches it to this Opinion.  *See* Exhibit A.  The email began by noting that a potential Government witness remained ill and so he would not testify in the Government's case-in-chief.  *Id.*  AUSA-1 then wrote "we've attached the following documents" and provided a bulleted list of about fifteen documents, at least two of which were marked for the first time as new Government exhibits.  *Id.*  All but one of these documents, GX 411, had already been disclosed through discovery; in other words, GX 411 was the *only* document on the list that had not already been provided to the defense.  Trial Tr. at 993:5–16 (noting that GX 411 "was the only document" on this list that had not previously been disclosed to the defense); *see also* Dkt. No. 354 at 13 (noting that the other documents were "mostly duplicates of 3500 material or revisions of exhibits").  The *third* bullet, which was virtually identical to the next bullet listing a previously disclosed document, stated as follows: "GX 411 – we intend to offer this Monday.  Let us know if you will stipulate to authenticity."  Ex. A.

Nothing in this email identified GX 411 as a newly disclosed document, a fact that we now know the Government lawyers were aware of and discussed with each other prior to transmittal.  To the contrary, the bulleted list deliberately obscured the fact that GX 411 was different in kind than the other exhibits listed, as it was the only exhibit on that list that had not been previously turned over to the defense.  Indeed, as noted, the Government's wording with respect to GX 411 was the same as its wording regarding another exhibit, GX 456, that had already been disclosed.  *See id.* (stating as to both exhibits, "we intend to offer this on Monday. Let us know if you will stipulate to authenticity.).  Nothing in this email indicated how long the Government had possessed the document.  And nothing indicated why the document was

disclosed one week into trial.  Indeed, the Government now concedes that "[t]his email does <u>not</u>, as we believe <u>it should have</u>, identify GX 411 as a new document that was not previously disclosed."  Dkt. No. 354 at 13 (emphasis in original); *see also* Dkt. No. 283 at 1 (Government admitting that it "fail[ed] to make accurate disclosures regarding the status of [GX 411] on March 7 and March 8, 2020.").  All four prosecutors who represented the Government at trial have admitted that the "[t]he transmittal email failed to disclose that GX 411 had not been produced previously" and that "there is *no dispute* that [this] was a failure in judgment on [their] part."  Dkt. No. 283 at 5 (emphasis added).

Surprisingly, the Government represents that this "failure in judgment" was no accident—it was the product of reasoned discussion among the prosecution team.  In addition to the contemporaneous communications among the AUSAs discussed above, the Government states that the prosecutors discussed how to disclose GX 411 before sending this email.  AUSA-1 and AUSA-3, both "confident that the defense would know it was a new document given their knowledge of the case," suggested "that the Government should simply produce it and wait for the defense's questions, and if the Government did not make a big deal about the document, the defense might decide that it was not important enough to object."  Dkt. No. 354 at 12.  In other words, according to their own after-the-fact account, the Government lawyers knew that GX 411 had not previously been disclosed, but nonetheless thought it best to call no attention to the document and hoped that the defense would stipulate to its authenticity with little fanfare.  That did not come to pass.

Even if the story stopped there, things would be bad enough.  No responsible Government lawyer should strategize how to "bury" a document that was not, but should have been, previously disclosed to the defense.  A responsible Government lawyer should—at a

minimum—forthrightly and truthfully reveal late disclosures to the defense. The leadership of

the USAO attempts to justify this conduct by arguing that what the prosecutors did was not, in

fact, "burying" a now-admittedly exculpatory document, and instead conveys to its prosecutors

and the Court that the conduct of the Government lawyers described above is not condemnable.

Dkt. No. 354 at 11 ("[T]he document, which was in fact produced less than 24 hours later, was

not buried. . . . [W]e believe it would go too far to condemn [AUSA-1] for a Friday night lapse in

thinking regarding a document that was in fact disclosed Saturday afternoon."). This Court

disagrees and hereby strongly condemns this conduct.

### E. The Government Makes a Misrepresentation to the Court

Unfortunately, that is not the end of the story. The day after this disclosure, Mr. Sadr

wrote to the Court, represented that the Government had produced GX 411 for the first time,

argued that GX 411 was *Brady* material, and sought a curative instruction. *See* Dkt. No. 274. In

simpler terms, Mr. Sadr argued that the Government had breached its constitutional duties in

failing to turn over this document, and asked the Court to explain that failure to the jury. The

Court quickly ordered the Government to make a "detailed representation" explaining why this

document was not disclosed, what led to its March 7 disclosure, and which attorneys were

involved in this process. Dkt. Nos. 286, 287. The Government provided a narrative that is now

familiar: the prosecution team incorrectly believed that GX 411 had been disclosed to Mr. Sadr

with the Commerzbank Subpoena Returns, and only realized it had not on March 6. Dkt. No.

275.

The vagueness of the Government's explanation immediately raised flags for the Court.

That same day, the Court issued an order stating that the Government had failed in its letter to

"indicate if, upon learning of the late disclosure [of GX 411], the Government informed defense

counsel or not." Dkt. No. 290. The Court thus ordered "the Government [to] explain precisely

when and how it realized that the document had been erroneously withheld," and—importantly for present purposes—"when, if at all, . . . the failure to disclose . . . was communicated to the defense." *Id.* This Order is also attached to this Opinion. *See* Exhibit B.

The Government's next letter is central to the lingering ethical questions in this case, and the Court likewise attaches it to this Opinion. *See* Exhibit C. In that letter, the Government recounted how its lawyers had "found" GX 411 on Friday evening and discussed the document the next day. *Id.* at 1. The Government then stated that it "promptly had a paralegal mark it as an exhibit and produced it to the defense along with other exhibits and 3500 materials." *Id.* The Court does not dwell on the Government's representation of promptness, though it does note that the Government disclosed GX 411 about twenty hours after it realized it had never been turned over, consistent with the discussion between the AUSAs about waiting a day in order to "bury" it with other documents. The Government next represented that it "*made clear [in its email] that GX 411 was a newly marked exhibit* and that we intended to offer it, and asked the defense if they would stipulate to authenticity." *Id.* (emphasis added).

To reiterate, the Court asked the Government a direct question: When and how did it inform the defense of the failure to timely *disclose* GX 411? *See* Ex. B. But the Government did not respond to that direct question with a direct answer. Rather, it answered that it had made clear in its March 7 email to defense counsel that GX 411 was newly *marked*. Ex. C. The Court finds that the Government's representation was misleading, as it implied that it had explicitly informed the defense that GX 411 was being disclosed for the first time. Indeed, the Court was misled. Upon receipt of that letter, the Court took great comfort in believing that, despite the disclosure failure, at the very least the Government had clearly indicated that GX 411 had not been previously disclosed. But that was not the truth. To the contrary, the Government placed

GX 411 in the middle of a bulleted list of several other documents, *all of which* had already been disclosed, and at least one other of which was newly marked. *See* Ex. A. The Government did not say that the exhibit was not previously disclosed. The Government did not indicate that GX 411 was different in any way from the other, already-disclosed attachments. Nor did the Government's request for a stipulation of authenticity make clear that this exhibit was newly disclosed—the Government made the same request as to another document on the list that had already been disclosed. *See id.* (GX 456). The Government admits that "[t]he transmittal email failed to disclose that GX 411 had not been produced previously." Dkt. No. 283 at 5.

What arguably occurred here is that at least some of the Government lawyers implemented and executed the strategy the prosecutors had discussed: to "bury" GX 411 by deceptively hiding it among several other documents that had previously been disclosed. Having gotten caught in this effort, the Government then made a misleading representation to the Court, perhaps in an attempt to make its conduct appear better than it was. To make matters worse, as recounted in more detail below, the Court has now learned that certain Government lawyers edited the sentence in question from an accurate recounting of the facts—the letter's first draft rightly stated that the "Government did not specifically identify that GX 411 had not previously been produced in discovery," *see* Dkt. No. 354 at 14—to its final, misleading form.

### F. Further Fact-Finding Is Necessary

Several critical questions remain regarding the untimely disclosure of GX 411 and the Government's subsequent misleading representation to the Court. The Court is obligated to determine what has occurred.

*First*, there are discrepancies presented to the Court about who knew what when regarding the provenance of GX 411. To start, as the Court has discussed, the SAUSA has presented two different stories about how and when he "rediscovered" GX 411. Moreover, the

SAUSA recalls discussing GX 411 "with AUSAs in January 2020," and further represents that "at or about [this] time, he had a telephone conversation with [AUSA-1] about 'how and from where' [GX 411] had been obtained." Dkt. No. 354 at 10 n.6. If this is true, it means that at least two prosecutors knew in January 2020 that GX 411 had not been disclosed as part of the Commerzbank Subpoena Production, yet they took no steps to produce the document to the defense or correct representations to the contrary made to the Court by other Government lawyers. *See, e.g.*, Dkt. No. 277 at 1–2; Trial Tr. at 982:13–17; *id.* at 984:11–19; Dkt. No. 283 at 5. For their part, the AUSAs deny this account and say they did not discuss GX 411 with the SAUSA in January 2020, and learned only in the middle of trial that the exhibit had not been disclosed. Dkt. No. 354 at 10 n.6. At this stage, the Court cannot determine which version is true.

*Second*, and relatedly, the Court cannot yet firmly conclude based on the existing factual record whether any of the Government lawyers deliberately withheld exculpatory information. The Government maintains that no prosecutor "had any inkling . . . that GX 411 would have exculpatory value for the defense" until defense counsel's emails on March 7. Dkt. No. 354 at 13. The Government further represents that "[h]ad any of the attorneys on the case recognized the exculpatory theory the defense has articulated, that would, we believe, have trigged further analysis, but they did not." *Id.* at 10. And during trial, the Government attributed its misunderstanding to "trial blinders." Trial Tr. at 991:10–992:19.

Certainly, the now-disclosed written, internal communications of the AUSAs—which discuss the usefulness of GX 411 to only the Government's case, and do not speak to its exculpatory value—support the Government's contention that none of the prosecutors recognized the document's now-conceded exculpatory value. The contention that trial blinders

prevented the prosecutors from perceiving the exculpatory value of GX 411 is plausible. But there are other facts in the current record that cast some doubt on this representation of ignorance. To start, by the time the AUSAs were discussing "burying" the document, even if not earlier, the relevance of GX 411 to the defense arguably should have been apparent. Indeed, for reasons already discussed above, GX 411 and subsequent responses to it by OFAC and the intermediary bank tend to demonstrate that Stratus International Contracting's affiliation with Stratus Group was not material to either OFAC or the intermediary banks, a point critical to the Government's ability to establish the elements of several charged counts. *See* Section III.A. Moreover, emails from the SAUSA in late January and early February further call the Government's contention into doubt. The SAUSA at that time notified the trial team that Commerzbank "filed a voluntary disclosure with OFAC regarding the payment [GX 411]," described this disclosure as an "asterisk," and suggested that the team "discuss whether it's worth having the Commerz witness go into that." Dkt. No. 341 at 8. And in a subsequent email, the SAUSA stated "we [the prosecution team] can discuss how we would want to handle" the Commerzbank disclosure. *Id.* Although there are alternative explanations available, these emails at least arguably suggest, as Mr. Sadr argues, that the prosecutors recognized that GX 411 was not wholly helpful to the Government and considered not calling a Commerzbank witness because doing so could lead to disclosure of this document—cutting against the Government's narrative that its prosecutors thought GX 411 was inculpatory. *See* Dkt. No. 355 at 3.

*Third*, there are discrepancies about which prosecutor(s) were involved in making the misrepresentation in the Government's March 8 letter. These discrepancies prevent the Court from resolving, at this time, whether the misrepresentation was intentional. The Government drafted the letter in question in about one hour. *See* Dkt. No. 354 at 14–15. To her credit, in the

letter's first draft, written by AUSA-1, the sentence in question stated, "The Government did not specifically identify that GX 411 had not previously been produced in discovery." *Id.* at 14. This sentence was directly responsive to the question the Court had asked and was accurate—had it been included in the final letter, this inquiry may have been avoided. But because AUSA-1 "was ill [and] had to leave the Office shortly after" circulating this first draft, *id.* at 14, the drafting of the letter was passed onto other prosecutors, and AUSA-3 took the lead. In the ten minutes before the Court's deadline, AUSA-3 sent AUSA-1's draft to the Co-Chiefs of the Terrorism & International Narcotics Division of the USAO and then spoke with them on the phone. *Id.* at 14–15. At some point in this process, this truthful sentence was edited to make the misrepresentation in question, becoming "The Government made clear that GX 411 was a newly marked exhibit . . . ." *Id.* at 15. AUSA-3 then filed the letter. *Id.* One minute after the Court's deadline, AUSA-3 emailed AUSA-2 saying, "They [the Chiefs] called me with some changes. I made them and filed." *Id.*

When pressed to disclose the prosecutor(s) responsible for this edit, the Government lawyers point fingers. The Unit Chiefs "advise[] that they did not request . . . deletion of the [original language], although they may have missed that deletion . . . if the final draft was read to them over the phone." Dkt. No. 356 at 2 n.1. Significantly, this runs contrary to one of the Unit Chief's explanation at trial on the day after the letter was drafted, when he informed the Court that "[The other Unit Chief] and I reviewed [this] letter in realtime before it was filed—our understanding in submitting [the misrepresentation] to your Honor was that this clearly marked language . . . related to the fact that the document had been marked as a government exhibit with a yellow government sticker. That is what we intended to convey with that." Trial Tr. at 997:14–20. In other words, nearly contemporaneously with the letter's drafting, the Unit Chiefs

represented that they were aware of this language and that it was purposely included in the Government's letter—but in post-trial briefing, the Chiefs claim that they did not request this change and may have missed it entirely.  For his part, AUSA-3 "recalls opening [AUSA-1's] draft during the call and making changes that he understood to reflect the input from the unit chiefs."  Dkt. No. 354 at 15.  AUSA-3 thus "filed a letter that he believed reflected the considered judgment of his supervisors."  *Id.*  And the other prosecutors' involvement is unclear; AUSA-1 had left the office due to illness by the time of these edits, and the Government says nothing about the SAUSA's and AUSA-2's roles.  *Id.*  Despite the extensive letter briefing about this issue, therefore, the Court still does not know which prosecutor(s) were responsible for making this misrepresentation.  Indeed, the Court notes that these drafting changes were first revealed only with the filing of the Government's July 2 letter, months after trial had ended and months after the Court inquired on the record about this precise misrepresentation.  *See* Trial Tr. 989:16–995:16, 996:18–998:18.  Fully understanding this drafting process is necessary to determine whether any of the prosecutors intentionally misled the Court.

* * * * *

Even though the Court has now granted Mr. Sadr's motion for a new trial, vacated the verdict against him, and dismissed the indictment with prejudice, the Court retains authority to sanction the prosecutors in this case.  *See United States v. Seltzer*, 227 F.3d 36, 41–42 (2d Cir. 2000) (discussing district courts' inherent power to impose sanctions).  The Government agrees that the Court retains this supervisory power.  Dkt. No. 352 at 2.

It is the fervent hope of the Court that no sanctions are necessary.  But it is the firm view of the Court that if Government lawyers acted in bad faith by knowingly withholding exculpatory material from the defense or intentionally made a misleading statement to the Court,

then some sanction or referral to the Grievance Committee of the Southern District of New York would be appropriate.  The record before the Court neither conclusively establishes intentionality nor resolves the issue.

Given the lack of clarity surrounding the disclosure of GX 411 and the subsequent misrepresentation to the Court, the Court requires further information.  The Court therefore orders each AUSA on the trial team, the two Unit Chiefs, and the SAUSA to submit individual declarations, under penalty of perjury, regarding these issues.  These declarations should, at a minimum, respond to the following questions with specificity:

1. When did you first learn of GX 411?

2. When did you first realize that GX 411 had not been disclosed to the defense? Why did you not immediately disclose the document at that time?

3. What specific communications did you have regarding GX 411 or the disclosure of GX 411 with other prosecutors, whether oral, written, or electronic in any form?  When did these communications occur?  Attach any record you have of any such communication.

4. When did you first recognize GX 411 as having exculpatory value?  If you thought the document was wholly inculpatory, provide a good-faith basis for that understanding.

5. With specificity, what role did you play in drafting the Government's March 8, 2020 letter?  *See* Ex. C.  What role did you play in deleting the accurate sentence responsive to the Court's question that was originally drafted by AUSA-1?  *See* Dkt. No. 354 at 14 ("The Government did not specifically identify that GX 411 had not previously been produced in discovery.").  What role did you play in drafting the sentence that the Court has concluded was a misrepresentation?  *See* Dkt. No. 277 at 1 ("The Government made clear that GX 411 was a newly marked exhibit . . . .").  Why was this sentence changed?  Attach any communications related to this change.

6. When the Court asked specific questions at trial on March 9, 2020 regarding the Government's misrepresentation, were you aware that the accurate sentence responsive to the Court's question had been edited or deleted?  If so, explain why this was not conveyed to the Court.

The declarations shall further provide any and all other information the prosecutor believes relevant to the unresolved issues identified in this Opinion. Following these declarations, the executive leadership for the USAO may submit letter briefing as to why no further proceeding for additional fact-finding or credibility determinations is necessary. Counsel for Mr. Sadr may file a responsive letter brief, and the Government may file a reply.

After the Court reviews these submissions, it will determine whether a hearing to conduct further fact-finding, including credibility determinations, is necessary.

## IV.    CONCLUSION

Almost a century ago, the Supreme Court defined the singular role federal prosecutors play in our system of justice:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done . . . .  He may prosecute with earnestness and vigor—indeed, he should do so.  But, while he may strike hard blows, he is not at liberty to strike foul ones.  It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Berger v. United States*, 295 U.S. 78, 88 (1935).

The Government in this case has failed to live up to these ideals. The Court has recounted these breaches of trust, proposed some systemic solutions, urged referral to the Office of Professional Responsibility for admitted prosecutorial failures apparent in the existing record, and ordered further fact-finding.  The cost of such Government misconduct is high.  With each misstep, the public faith in the criminal-justice system further erodes.  With each document wrongfully withheld, an innocent person faces the chance of wrongful conviction.  And with each unforced Government error, the likelihood grows that a reviewing court will be forced to

33

reverse a conviction or even dismiss an indictment, resulting in wasted resources, delayed justice, and individuals guilty of crimes potentially going unpunished.

The Court thus issues this Opinion with hopes that in future prosecutions, the United States Attorney for the Southern District of New York will use only "legitimate means to bring about a just" result. *Id.* Nothing less is expected of the revered Office of the United States Attorney for the Southern District of New York. That Office has a well- and hard-earned reputation for outstanding lawyers, fierce independence, and the highest of ethical standards. The daily work of the prosecutors in that Office is critically important to the safety of our community and the rule of law. Those who stand up in court every day on behalf of that Office get the benefit of that reputation—but they also have the responsibility to maintain it.

The Court hereby ORDERS that the Acting United States Attorney ensure that all current AUSAs and SAUSAs read this Opinion. Within one week of the date of this Opinion, the Acting United States Attorney shall file a declaration affirming that this has occurred.

The Court FURTHER ORDERS that each of the trial team AUSAs, supervising Unit Chiefs, and the SAUSA submit the declarations described in Section III no later than October 16, 2020. By October 30, 2020, the executive leadership for the USAO may submit a brief as to why no further proceeding for additional fact-finding or credibility determinations is necessary. Counsel for Mr. Sadr may, if they wish, submit a responsive filing by November 13, 2020, and the Government a reply by November 20, 2020.

SO ORDERED.

Dated: September 16, 2020
      New York, New York

_____
ALISON J. NATHAN
United States District Judge

# Exhibit A

**From:** ████████████████████
**Sent:** Saturday, March 07, 2020 4:04 PM
**To:** ████████████████████████████████████████████
████████████████████
**Cc:** ██████████████████████████████████████████
████████████
**Subject:** U.S. v. Sadr

Counsel,

Mr. Dubowitz is still very ill. As a result, we do not intend to call him as a witness in our case-in-chief.  It's possible that, depending on the defense case, we will call him as a rebuttal witness.

In addition, we've attached the following documents:

- Updated GX 2284D – there were formatting problems with our version. We think the attached corrects them.
- 3508-08 – 3500 from today
- GX 411 – we intend to offer this on Monday. Let us know if you will stipulate to authenticity.
- GX 456 – we intend to offer this on Monday. Let us know if you will stipulate to authenticity.
- GX 495A & B – we intend to offer these on Monday (likely in redacted form), although think a stipulation that the defendant had bank accounts at HSBC from January 2010 through October 2013 might be simpler. Let us know how you prefer to proceed.
- GX 704 – this is the modified version of the travel chart. Please confirm whether you have any remaining concerns.
- GX 705A & B – these are summary charts reflecting the information in GX 2090A. Please confirm whether you have any objections.
- Updated GX 2304A – we enlarged some of the cells, as the formatting of the PDFd excel file was cutting off some of the data. The content is the same.
- 3504-10 – Peri 3500, which was provided in hard copy yesterday morning.
- 3505-06 – Blair 3500, which was provided in hard copy yesterday morning.
- 3513-02 – Paralegal 3500 for summary chart (you may already have this)
- 3513-03 – Paralegal 3500 for summary chart (you may already have this)

We are still working on one additional summary chart, which we expect to provide later today.

████████████████
Assistant United States Attorney
Southern District of New York
One Saint Andrew's Plaza
New York, NY 10007
Tel: ████████████████

# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: MAR 1 0 2020

United States of America,

—v—

Ali Sadr Hashemi Nejad,

Defendants.

18-cr-224 (AJN)

ORDER

ALISON J. NATHAN, District Judge:

In the letter filed this evening by the Government, Dkt. No. 275, the Government states

that "It was only in the context of this process that the Government realized that GX 411 was not

part of Bank-1's subpoena production, which had been provided to the defense in discovery."

The Court requires further explanation. Specifically, it is unclear from this sentence if

the Government realized GX 411 had not been previously disclosed before or after the

Government turned it over to the defense yesterday. Nor does this sentence indicate if, upon

learning of the late disclosure, the Government informed defense counsel or not. The

Government shall explain precisely when and how it realized that the document had erroneously

been withheld and when, if at all, upon learning of the failure to disclose this was communicated

to the defense.

Furthermore, the previously filed letter does not offer an explanation for how it came to

be that GX 411 was not (though should have been) provided to the defense as part of Bank-1's

subpoena production.

The Government is ordered to address these points by letter to be filed no later than 10

p.m. this evening. The defense may reply to the Government's letters by 11 p.m.

1

SO ORDERED.

Dated:  March 8, 2020
        New York, New York

3/8/20

_____
        ALISON J. NATHAN
   United States District Judge

# Exhibit C



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 8, 2020

**FILED BY ECF**

The Honorable Alison J. Nathan
United States District Judge
Southern District of New York
United States Courthouse
40 Foley Square, Courtroom 1306
New York, New York 10007

      **Re:**    ***United States* v. *Ali Sadr Hashemi Nejad*, 18 Cr. 224 (AJN)**

Dear Judge Nathan:

      The Court writes in response to the Court's order from 9:00 this evening. The Government apologizes for the lack of clarity in its prior email.

      The Government found GX 411 in its emails on Friday night, looked at the Bank-1 subpoena production, and did not find it. The members of the team discussed the document the next morning and confirmed that it likely had not been produced to the defense previously. The Government promptly had a paralegal mark it as an exhibit and produced it to the defense along with other exhibits and 3500 materials. The Government made clear that GX 411 was a newly marked exhibit and that we intended to offer it, and asked the defense if they would stipulate to authenticity. Defense counsel responded shortly after the Government provided GX 411 and asked how long the Government had GX 411, and why they had not previously received it. The Government responded and explained that we had been aware of the letter since mid-January, and that, at the time, the Government had mistakenly believed it was part of the discovery in the case.

      When SAUSA ████ sent what is now GX 411 to the AUSAs in the case in January, the AUSAs assumed that this was a document that came from this case (specifically, the subpoena to Bank-1), and that it was therefore a document that had been previously produced to the defense as part of the Rule 16 discovery. This was an incorrect assumption. The document in fact was

The Honorable Alison J. Nathan, U.S.D.J.
March 8, 2020
Page 2

obtained in an unrelated DANY investigation and was not provided to this Office before January
2020.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By:      /s/
        ████████████████████
        Assistant United States Attorneys
        ████████████
        Special Assistant United States Attorney
        (212) 637-2038 / 2279 / 1066

cc: Defense Counsel (by ECF)