USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 4|3914243

United States of America,

—v—

Ali Sadr Hashemi Nejad,

Defendant.

18-cr-224 (AJN)

OPINION & ORDER

ALISON J. NATHAN, District Judge:

The Government's prosecution of Mr. Sadr for alleged evasion of sanctions against Iran was marred by repeated failures to disclose exculpatory evidence and misuse of search-warrant returns. These errors were so severe that following a jury verdict in its favor, the Government determined that further prosecution of the case would not be in the interests of justice. On the joint request of the parties, the Court vacated the jury verdict and dismissed the charges against Mr. Sadr with prejudice.

The Court chronicled this extraordinary saga in its prior Opinion in this case dated September 16, 2020. *See United States v. Nejad*, No. 18-cr-224 (AJN), 2020 WL 5549931 (S.D.N.Y. Sept. 16, 2020). In that Opinion, the Court focused primarily on one of the many documents not timely disclosed to the defense, a letter from Commerzbank to the Office of Foreign Assets Control (OFAC), later marked as GX 411, that the Government did not disclose until days into trial and that it now concedes had exculpatory value. Special Assistant United States Attorney (SAUSA) Lynch, detailed from the Manhattan District Attorney's Office (DANY), had the document in his possession from an earlier DANY investigation before the Government commenced its case against Mr. Sadr. He discussed and then shared it with AUSAs

Lake, Kim, and Krouse in late 2019 and early 2020. Yet no one on the prosecution team shared it with the defense until March 7, 2020—a day after they had decided to introduce it as evidence in their case-in-chief.

Once the Government realized its error, it did not forthrightly inform the defense that it had failed to disclose GX 411. Instead, the Government undertook to "bury it" in a list of previously disclosed documents. Prosecutors discussed how best to turn GX 411 over to the defense without drawing attention to its late disclosure. They minimized and obfuscated when pressed for an explanation. After the Court ordered the Government to explain whether it had informed the defense that GX 411 had not previously been disclosed in discovery, the Government then falsely implied that it had.

To develop a record, the Court directed the prosecutors in its September 16 Opinion to submit declarations under penalty of perjury detailing how they learned of the document that became GX 411, when they realized it had exculpatory value, and what role they played in drafting the March 8 letter to the Court that misrepresented the circumstances of the Government's disclosure of the document to the defense. *See Nejad*, 2020 WL 5549931, at *15. In particular, the Court had continuing questions about whether prosecutors' disclosure violations or misrepresentation to the Court were intentional. The Court then requested briefing on whether a further evidentiary hearing was necessary. *Id.*

The prosecutors have now filed their declarations, and the Government has urged that no further fact-finding is necessary. *See* Dkt. No. 390. The prosecutors have requested that their declarations and the exhibits be maintained under seal, and the parties have filed letters under seal that reference the declarations. *See* Dkt. Nos. 383–87, 394–95. Mr. Sadr and two press

organizations oppose sealing.  *See* Dkt. Nos. 388–89, 393–94.  Astonishingly, even in its latest filings, the Government has informed the Court of yet another failure of disclosure in this case related to the FBI's review of raw search-warrant returns provided by DANY.  *See* Dkt. No. 391.

The Court remains of the view expressed in its September 16 Opinion that the disclosure failures and misrepresentations in this case represent grave derelictions of prosecutorial responsibility.  The trial team's failure to promptly investigate the origins of GX 411 and to communicate about discovery with other governmental agencies reflects a systematic disregard of their disclosure obligations.  Prosecutors then compounded these missteps through a sustained pattern of refusing to fess up.

However, as discussed below, based on the record before it, the Court does not conclude that any of the prosecutors knowingly withheld exculpatory information or intentionally misrepresented facts to the Court.  In light of this, and given the systemic nature of the errors and misconduct that occurred in this case, the Court will not engage in further fact-finding.  Instead, the Court urges a full investigation by DOJ's Office of Professional Responsibility (OPR) of all matters related to prosecutorial misconduct in this case.  Moreover, the Government has represented that it is implementing new training protocols for prosecutors and FBI case agents and improving its infrastructure for data management and disclosure.  *See* Dkt. Nos. 391, 396.  It is the Court's hope that these reforms, coupled with a full investigation by OPR, will ensure that the Government's errors in this case are not repeated.

Beyond this, accountability and reform can also come from sunlight.  The prosecutorial misconduct in this case is of exceptional public interest, bearing both on the fair administration of justice for criminal defendants and the efficacious prosecution of violations of federal law.

The Court presumes that the matters identified in this Opinion will be fully investigated by OPR. But public confidence in the administration of justice depends also on public accountability. As explained below, the Court concludes that the public interest in access to the prosecutor declarations, exhibits, and party letters in this case outweighs the privacy interests of those involved, and so orders release of substantially all of those materials.

This Opinion proceeds in three parts. First, the Court considers whether the record, as developed by the prosecutor declarations and exhibits, shows that any of the prosecutors intentionally withheld exculpatory material or made a knowing misstatement to the Court. Second, the Court discusses the new revelations by the Government that the FBI uploaded raw email search-warrant returns into its "BIDMAS" database and searched this database hundreds of times, contrary to the Government's representations in its suppression motion briefing and almost certainly in violation of the Constitution. Third, the Court analyzes the request of the Government and prosecutors to maintain filings related to the prosecutorial misconduct in this case under seal.

## I. PROSECUTORIAL MISCONDUCT

As the Court recounted in detail in its September 16 Opinion, the Government's failure to disclose GX 411 was the last in a long line of disclosure-related missteps in its prosecution of Mr. Sadr. *See Nejad*, 2020 WL 5549931, at *4–6. The Government's misstatements about the circumstances in which it disclosed GX 411 followed other misstatements about how investigators handled evidence obtained from earlier DANY investigations. *Id.* at *3–4. The Court assumes familiarity with its prior Opinion, but repeats facts as necessary here to analyze whether the prosecutorial misconduct concerning GX 411 was intentional. The Court first

considers prosecutors' failure to timely disclose GX 411 and then turns to the misrepresentation to the Court about the circumstances of that disclosure.

## A. The Prosecutors' Failure to Disclose GX 411

Prosecutors from DANY obtained the OFAC report that would become GX 411 in connection with a separate investigation around March 2015. Then-Assistant District Attorney Lynch reviewed it later that year. Lynch Decl. ¶ 3. He joined the prosecution team as an SAUSA in June 2017. Lynch Decl. ¶ 1. SAUSA Lynch discovered the document again while reviewing files in his office in late 2019 and mentioned it to members of the federal prosecution team in a December 19, 2019 email to AUSAs Lake, Krouse, and Kim. Lynch Decl. ¶ 5; Lynch Decl., Ex. 1. This appears to have been the first time the AUSAs became aware of GX 411.

In the December 2019 email exchange, SAUSA Lynch explained that Commerzbank had acted as an intermediary for one of the payments underlying the Government's charges against Mr. Sadr and filed a report with OFAC. AUSA Kim asked SAUSA Lynch to let her know if he thought of a way to incorporate that information into a motion she was working on. The prosecutors do not appear to have discussed the document further at the time.

SAUSA Lynch raised Commerzbank's OFAC report again, and sent a copy of the document to the AUSAs for the first time, on January 10, 2020. Lynch Decl. ¶ 6. In that email, he wrote, "In the spirit of closing the loop on the $29M payment through Commerz, attached is the voluntary disclosure Commerz[] made to OFAC re: the payment." Lynch Decl., Ex. 2. SAUSA Lynch did not explain where the document had come from, and the AUSA's do not appear to have asked. The AUSAs had not seen GX 411 before January 10, 2020. *See* Krouse Decl. ¶ 10; Lake Decl. ¶ 2; Kim Decl. ¶ 6. For his part, SAUSA Lynch states that "[t]he AUSAs

handled the production of discovery in this case." Lynch Decl. ¶ 4.

The trial team's last pretrial discussion of GX 411 took place in an email exchange later that month. On January 30, SAUSA Lynch suggested to the AUSAs that the prosecution would need a witness from Commerzbank, because it was the sole intermediary for that payment. Lynch Decl., Ex. 3. The next day, he raised the prospect that GX 411 might affect their strategy concerning a Commerzbank witness: "The other asterisk with Commerz is that they filed a voluntary disclosure with OFAC regarding the payment—we should discuss whether it's worth having the Commerz witness go into that." Lynch Decl., Ex. 4. SAUSA Lynch spoke with a contact at Commerzbank and then wrote another email to the team: "[Commerzbank] discovered the Stratus payment and filed the voluntary disclosure due to our investigation into the bank. That makes sense since they discovered the payment retroactively; it wasn't flagged in real time. So we can discuss how we would want to handle." *Id.* SAUSA Lynch and AUSA Lake discussed the issue and decided not to call a Commerzbank witness, because testimony regarding Commerzbank's "look-back" would distract from their case. *See* Lynch Decl. ¶ 8; Lake Decl. ¶¶ 12, 15. The Unit Chiefs were not included on these emails and appear not to have been aware of the existence of the document until after it was produced to the defense. *See* Bove Decl. ¶ 6; Crowley Decl. ¶¶ 6–7.

The prosecutors did not discuss GX 411 again until March 6, 2020, five days into trial. AUSA Lake discovered the January 10 email in her inbox while reviewing old emails and forwarded it to the other AUSAs. Lake Decl. ¶ 18. She wrote in her email that she could not find GX 411 in the Government's Commerzbank subpoena returns and was not sure whether the Government had produced it to the defense. *Id.* She repeated in a chat conversation with AUSA

Kim that evening that she had "no idea where that letter came from" and "[did not] think it ha[d] ever been produced to the defense."  Kim Decl., Ex. 19.

Based on the prosecutor declarations, the Court does not find that prosecutors intentionally withheld GX 411 from the defense.  Instead, it appears that the failure to disclose GX 411 resulted from a lack of communication between the members of the prosecution team and quite serious lack of attention to their disclosure obligations.  Prior to March 6, only SAUSA Lynch knew that GX 411 was obtained from an unrelated DANY investigation and thus not among the subpoena returns that had been produced to the defense.  *See* Lynch Decl. ¶ 8; Krouse Decl. ¶¶ 7–8; Lake Decl. ¶ 13; Kim Decl. ¶ 6.  He appears—wrongly—to have believed that he bore no responsibility for the Government's *Brady* obligations and that the AUSAs would ensure all necessary documents were produced without his input.  The AUSAs, meanwhile, appear not to have considered that they might not yet have produced GX 411 to the defense when SAUSA Lynch alerted them to the document in early 2020, even as they discussed that the OFAC report might complicate testimony from a Commerzbank witness.

The Court also credits the AUSAs' statements that they did not appreciate the potential exculpatory value of GX 411 during their brief discussions of the document before trial.  *See* Krouse Decl. ¶¶ 33–34; Lake Decl. ¶ 48; Kim Decl. ¶ 31.  AUSA Krouse had not read GX 411 prior to its production to the defense.  Krouse Decl. ¶¶ 33–34.  AUSAs Lake and Kim appear to have believed that GX 411 bolstered the Government's case for materiality when they decided to introduce it at trial.  *See* Lake Decl. ¶¶ 50–52; Kim Decl. ¶ 32.  The defense rightly notes that the SAUSA's description of GX 411 as presenting an "asterisk" that the prosecutors would need to decide "how to handle" could be read to suggest that the prosecutors understood the document to

be exculpatory.  However, the Court finds it plausible and credits that the prosecutors decided not to call a Commerzbank witness to discuss GX 411 because testimony about the DANY investigation that prompted the bank to conduct a "look-back" would confuse and distract the jury.  *See* Lynch Decl. ¶ 8; Lake Decl. ¶¶ 12, 15.

The Court emphasizes that the line prosecutors' handling of GX 411, including the lack of attention to its potential exculpatory value, fell far short of their constitutional and ethical obligations.   For one, the line prosecutors should have recognized the potential exculpatory value of GX 411, as the Unit Chiefs now testify that they did when they first reviewed the document.  *See* Bove Decl. ¶ 43; Crowley Decl. ¶ 10.  However, even if they were unsure whether the document would have been valuable to the defense, they should have produced it. Federal Rule of Criminal Procedure 16 requires the disclosure of documents material to preparing the defense.  Trust in the fair administration of justice requires that prosecutors "will resolve doubtful questions in favor of disclosure."  *Kyles v. Whitley*, 514 U.S. 419, 439 (1995) (quoting *United States v. Agurs*, 427 U.S. 97, 108 (1976)).  Judged objectively, the potential exculpatory value of GX 411 was not a particularly doubtful question.  Its materiality was even less so.  As the Court explained in its September 16 Opinion and the Government now concedes, GX 411 undercut the Government's case because it suggested that the manner in which Mr. Sadr structured the charged transactions was neither intended to nor likely to obstruct OFAC enforcement.  *See Nejad*, 2020 WL 5549931, at *7–8.  But the Court does not conclude that the AUSAs in fact appreciated GX 411's exculpatory value at the time, however apparent it may be in hindsight.

Although the record does not reflect that prosecutors intentionally withheld GX 411 from

the defense, that they failed to investigate whether GX 411 had been produced until they decided to offer it as an exhibit is part of a disturbing pattern. The Court discussed at length in its September 16 Opinion several categories of documents that prosecutors failed to produce because they did not adequately communicate with the FBI about material in its possession. *See Nejad*, 2020 WL 5549931, at \*4–6. In one instance, the AUSAs learned of an undisclosed document and discussed asking a Unit Chief whether it should be disclosed, but then did not further pursue the question. *Id.* at \*5. Prosecutors also failed to communicate with the FBI about its searches of search-warrant returns from DANY, resulting in misstatements in the Government's opposition to Mr. Sadr's suppression motion. *Id.* at \*3–4. As a rule, the prosecutors seem to have neglected to reasonably communicate with one another and with other governmental agencies to ensure they were in compliance with their disclosure obligations. The supervising Unit Chiefs appear to have offered little in the way of supervision. This reflects serious individual lapses on the part of the prosecutors in this case. But it also suggests broader institutional failure. It is the Court's view, as discussed at length in the Court's September 16 Opinion, that only institutional reforms can ensure these mistakes are not repeated.

### B.       The Prosecutors' Misrepresentation to the Court

The Government's mishandling of GX 411 unfortunately did not end with its failure to disclose the document prior to trial. As explained below, what followed were a series of actions designed to distract from the late disclosure and minimize the Government's apparent culpability, culminating in a misrepresentation to the Court about whether prosecutors clearly identified GX 411 to the defense as a newly disclosed document.

Mr. Sadr's trial commenced on Monday, March 2, 2020. That Friday evening, around

7:45 p.m., AUSA Lake discovered SAUSA Lynch's January 10 email that included GX 411 when reviewing old emails in her inbox.  Lake Decl. ¶ 3.  AUSA Lake did not recall seeing the document in the weeks leading up to trial, and so wondered if the Government had produced it to the defense.  *Id.*  She circulated the email to the SAUSA and AUSAs, writing that she thought the document could be helpful to the Government's case but that she was not sure if it had been produced.  Krouse Decl., Ex. 4.  In that email, she asked SAUSA Lynch if he knew where the document came from.  SAUSA Lynch did not immediately respond by email, but he and AUSA Lake had at least one conversation about the origins of the GX 411 that evening.  *See* Lynch Decl. ¶ 9.  In that conversation, AUSA Lake said that she believed the Government should offer GX 411 as an exhibit and asked SAUSA Lynch to obtain a witness from Commerzbank.  *Id.* SAUSA Lynch sent an email to his contact at Commerzbank later that night.  *Id.*; Lynch Decl., Ex. 5.

Beginning at 7:53 p.m., AUSAs Lake and Kim spoke via online chat about GX 411.  *See* Kim Decl., Ex. 19.  AUSA Lake explained that she had learned from SAUSA Lynch that the document was obtained through an unrelated DANY investigation, and that she therefore did not believe it had been produced.  SAUSA Kim wrote that they should "produce it tonight" so that the defense would have three days to review it before they introduced it into evidence.  AUSA Lake suggested they instead "wait until tomorrow and bury it in some other documents."  AUSA Kim agreed, suggesting other documents among which GX 411 could be buried: "that's fine too—some of the [Financial Action Task Force] stuff."

And so they tried to bury it.  The Government did not produce GX 411 Friday night, as AUSA Kim had first suggested, or even first thing in the morning.  Instead, the AUSAs held a

morning conference call to discuss the document and whether they should attempt to offer it as an exhibit.  *See* Krouse Decl. ¶ 21; Lake Decl. ¶ 6; Kim Decl. ¶ 6.  As the Court explained in its September 16 Opinion, the Government all but admits that the prosecutors would not have disclosed GX 411 at all if they had decided not to offer it at trial.  *See Nejad*, 2020 WL 5549931, at *10.  A near miss of significant constitutional import.

The Government ultimately produced GX 411 to the defense by email at 4:04 p.m. on Saturday, nearly a full day after AUSA Lake first realized the Government had not previously disclosed it.  *See* Dkt. No. 279-1.  In that email, AUSA Lake listed GX 411 as the third item on a list of twelve sets of attached documents.  The other documents all had previously been disclosed.  AUSA Lake used identical language to describe GX 411 as she used for another previously disclosed document: "[W]e intend to offer this on Monday.  Let us know if you will stipulate to authenticity."  Nowhere did the email suggest that GX 411 had not previously been disclosed or distinguish it from the other items among which it was buried.  As the Court explained in its September 16 Opinion, this email can only be understood as a deliberate attempt to obscure that GX 411 differed in kind from the other exhibits listed.  *See Nejad*, 2020 WL 5549931, at *10.  Nothing in the prosecutors' declarations persuades the Court otherwise.

These efforts to obscure the late disclosure of GX 411 were unsuccessful, but prosecutors persisted in their attempts to downplay the late disclosure and resist any suggestion of culpability.  Within an hour of receiving AUSA Lake's email, defense counsel responded requesting an explanation of the late disclosure.  Defense counsel's email noted that GX 411 would have been useful in cross-examination of the Government's OFAC witness.  Instead of offering a candid and conciliatory explanation, AUSA Kim wrote back disputing that GX 411

qualified as *Brady* material.  Dkt. No. 279-1.  As to the reason for the late disclosure, AUSA Kim wrote, "We thought it was part of the Commerzbank subpoena return that was produced in discovery.  We now understand that it came from an unrelated DANY investigation, and therefore was not in the Commerzbank subpoena return."

Reading AUSA Kim's email the next evening, Chief Bove in private and contemporaneously characterized the statement that "We now understand [that the document was not previously produced]" as a "[f]lat lie" in a text message to Chief Crowley.  Bove Decl., Ex. 27.  Chief Bove now calls this an unfair characterization.  Bove Decl. ¶ 31.  But the Court agrees with Chief Bove that the sentence in AUSA Kim's email inaccurately suggested that the trial team did not realize that GX 411 had not previously been disclosed until the defense so alerted them.  *See id.*  In fact, the AUSAs knew and discussed internally that the document had not previously been disclosed when they sought to bury it in a list of previously disclosed documents.

The Government continued to obfuscate this point after the Court directed it to provide a detailed explanation of its late disclosure of GX 411 the next day.  In its first March 8 letter to the Court, filed around 7:00 p.m., the Government did not state that prosecutors had learned on March 6 that GX 411 had not been disclosed.  Instead, it wrote that "AUSA Lake came upon GX 411 in Outlook . . . .  At the time, AUSA Lake concluded that the Government may wish to offer GX 411 in its case in chief, consulted the other members of the prosecution team, marked GX 411 as an exhibit, and emailed it to defense counsel.  It was only in the context of this process that the  Government realized that GX 411 was not part of Bank-1's subpoena production, which had been provided to the defense in discovery."  Dkt. No. 275.  The 7:00 p.m. letter did not

specify when in "the context of this process" that realization occurred. AUSA Lake drafted the 7:00 p.m. letter with input from the Unit Chiefs. *See* Lake Decl. ¶¶ 37–38; Crowley Decl. ¶ 13. Like AUSA Kim's email to defense counsel, the 7:00 p.m. letter implied, or at least allowed, that prosecutors did not realize GX 411 had not previously been disclosed when they buried it among eleven other previously disclosed documents. That is, the prosecutors continued to evade responsibility for the manner in which they disclosed GX 411 rather than offering a forthright explanation.

The ambiguity of the Government's 7:00 p.m. letter was not lost on the Court. *See Nejad*, 2020 WL 5549931, at *12. So the Court issued another Order at 9:05 p.m. demanding an answer to the question the Government had tiptoed around in its 7:00 p.m. letter: exactly when did the Government communicate its failure to disclose GX 411 to the defense? The Order directed a response by 10:00 p.m. to allow time for a defense response before trial resumed the next morning. Dkt. No. 290. AUSA Kim forwarded the Order to the Unit Chiefs, and AUSA Lake began to prepare a draft. Lake Decl. ¶¶ 39–40. Because she had to leave the office and could no longer work on the response, AUSA Lake sent a draft of the Government's letter to the other AUSAs and SAUSA at 9:31 p.m. Bove Decl., Ex. 23. Lake Decl. ¶ 40. AUSA Krouse forwarded the draft to the Unit Chiefs at 9:49 p.m. Bove Decl., Ex. 23. AUSA Krouse and the Unit Chiefs spoke briefly by phone around 9:52 p.m., and then AUSA Krouse filed the letter. Bove Decl. ¶ 25; Crowley Decl. ¶ 21; Krouse Decl. ¶ 90.

The draft that AUSA Lake circulated to the trial team, and that AUSA Krouse forwarded to the Unit Chiefs, contained an accurate description of the email by which the Government first provided GX 411 to the defense: "The Government did not specifically identify that GX 411 had

not previously been produced in discovery." Krouse Decl. ¶ 90. The filed version of the letter did not. Instead, that sentence had been edited to read: "The Government made clear that GX 411 was a newly marked exhibit and that we intended to offer it, and asked the defense if they would stipulate to authenticity." As the Court observed in its September 16 Opinion, the sentence in the filed letter was misleading. *See Nejad*, 2020 WL 5549931, at *12. It falsely implied that the Government had identified GX 411 to the defense as a document that it had not previously produced.

AUSA Krouse made these changes during or immediately after his call with the Unit Chiefs. AUSA Krouse states in his declaration that he edited the draft "based on what [he] understood at the time to be the unit chiefs' requests," although he acknowledges that he "may have misunderstood the unit chiefs' comments over the phone or inadvertently made an error in a rush to meet the filing deadline." Krouse Decl. ¶ 91. The Unit Chiefs maintain that they did not instruct AUSA Krouse to edit the sentence in question. Chief Crowley states that she did not review the draft before speaking with AUSA Krouse. Crowley Decl. ¶ 21. Chief Bove states that he reviewed AUSA Lake's draft on his cell phone, but that the Unit Chiefs and AUSA Krouse did not discuss that sentence during the call. Bove Decl. ¶¶ 44–46.

Whether the misrepresentation was intentional or not, the Unit Chiefs recognized upon reading the filed letter the following morning that it contained a misrepresentation. Bove Decl., Ex. 34. "I have mixed feelings about sympathy [for how the AUSAs would fare in the upcoming hearing]," Chief Bove wrote in a text message to Chief Crowley. "[T]hey've done some pretty aggressive stuff here over the last few days." Chief Crowley responded: "Yeah we lied in that letter."

Yet AUSA Krouse and the Unit Chiefs took a different tone in a hearing before the Court only an hour later. AUSA Krouse characterized the statement in the letter as "imprecise." Dkt. No. 322 at 991. Chief Bove then addressed the Court. While offering an apology, he too suggested that language was intended to convey something meaningful and true to the Court: "Ms. Crowley and I reviewed that letter in realtime before it was filed—our understanding in submitting that language to your Honor was that this clearly marked language that has been addressed here this morning related to the fact that the document had been marked as a government exhibit with a yellow government sticker. That is what we intended to convey with that." *Id.* at 997. As before, the prosecutors—including the Unit Chiefs—dug themselves in deeper rather than squarely take responsibility for their past missteps.

Nonetheless, upon review of the prosecutor declarations and email correspondence from the night of March 8, the Court does not find that any of the prosecutors intentionally misled the Court in the 10:00 p.m. letter. AUSA Krouse, who was less familiar with the issue addressed in the letter because he had been working on closing arguments, changed the accurate sentence drafted by AUSA Lake to the misleading one filed with the Court during a chaotic window of about eight minutes during which he spoke with the Unit Chiefs by conference call and rushed to file the letter by the Court's 10:00 p.m. deadline. In these circumstances, his claim that he did not appreciate that the letter was inaccurate is plausible. Nor could AUSA Krouse have realistically believed, if the misrepresentation were intentional, that it would have escaped the Court's notice. The Court also takes the Unit Chiefs at their word that during their call with AUSA Krouse—which phone records reflect lasted less than two minutes—they did not instruct him to change the sentence in question. What the Unit Chiefs plainly did not do, however, was

provide sufficient supervision to ensure the accuracy of the response to the Court.

While the Court does not find intentional misconduct, the conduct of the prosecutors in this case was far from acceptable. Prosecutors have an obligation to ensure that their disclosures to the defense are complete and their representations to the court are correct. These obligations require affirmative diligence, not only the absence of abject bad faith. As important, public confidence in the administration of justice depends on prosecutors owning and rectifying their mistakes. Though the Government now appears to be treating the shortcomings unearthed in this case with the appropriate seriousness, it does so only following long-sustained recalcitrance. It is imperative that prosecutors fulfill their constitutional and ethical obligations with the same zeal with which they pursue convictions—not reluctantly, not only after prodding, and not with measured half-truths. The Court hopes and believes that the attorneys of United States Attorney's Office will take to heart the lessons of this case and keep in mind that the prosecutor's first duty is not to prevail in every case but to ensure "that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935).

## II.     THE FBI'S MISUSE OF RAW SEARCH-WARRANT RETURNS

The Court turns now to the latest disclosure of misconduct reported by the Government for the first time in its recent filings. As the Court noted in its September 16 Opinion, some of the Government's most troubling errors in this case relate to its conduct in suppression litigation. *See Nejad*, 2020 WL 5549931, at *3. The Government represented throughout extensive suppressive litigation that it reviewed documents gleaned from DANY search-warrant returns only after DANY had identified those documents as pertinent to violations of state law. In fact, the Government admitted in July 2020—long after the suppression litigation and trial had

ended—that the FBI had directed DANY personnel to sweep their state search-warrant returns more broadly for information pertaining to the FBI's investigation of federal offenses. *Id.* at 4*. Now the Government confesses for the first time in an October 30 letter that the FBI's misuse of state search-warrant returns was much more systematic. Dkt. No. 391.

Far from a series of isolated searches performed by DANY personnel at the FBI's request, it appears that the FBI obtained the entirety of raw email search-warrant returns from DANY and entered them into its BIDMAS database, a proprietary platform it uses for document review. *Id.* The FBI then conducted approximately 636 searches of the database between January 2015 and January 2017. As the Court explained in its September 16 Opinion, the Government's search of raw state search-warrant returns for material pertinent to violations of federal law was likely unconstitutional because those searches would not have conformed to the warrants, which authorized searches only for material pertinent to violations of state law. *See Nejad*, 2020 WL 5549931, at *4. More egregious still, this fact was never disclosed to the defense during the suppression litigation and thus never the subject of full briefing and an adjudication by the Court. To the contrary, the Government specifically represented that it searched only "hot docs" already identified by DANY as responsive to the state warrants. *Id.* The Court relied on that representation in deciding disputed suppression issues. Only following multiple orders directing the Government to study its conduct in this case, many months since trial has concluded, have these troubling details finally come to light.

Nothing in the record indicates that the prosecutors in this case were aware of the FBI's BIDMAS searches, which took place before the Government's prosecution of Mr. Sadr began. *See* Dkt. No. 391, at *3; *see also* Krouse Decl. ¶ 4 (AUSA Krouse assigned to the case in April

2019); Lake Decl. ¶ 1 (AUSA Lake assigned to the case in September 2019); Kim Decl. ¶ 4
(AUSA Kim assigned to the case in April 2019).  The Court credits the Government's
representation that the AUSAs were not aware that the FBI possessed or searched raw search-
warrant returns apart from one return for which an FBI agent served as the warrant application
affiant.  *Id.* at *3 & n.5.

However, the Government's failure to inform the Court of the FBI's use of raw state
search-warrant returns during the suppression litigation reflects an abject breakdown in
communication between the U.S. Attorney's Office and the FBI and a shocking dereliction of
prosecutorial responsibility.  It boggles the mind that, in preparing their briefing for the extensive
suppression litigation in this case, prosecutors failed to ascertain that the FBI had loaded raw
search-warrant returns from DANY into a database and run over six hundred searches on that
database.  Whether the prosecutors did not think to ask or the FBI did not think to tell, something
went very seriously awry.  This episode also raises questions about the FBI's attention to the
limits of the Fourth Amendment in its use of the BIDMAS system more broadly.  It is the
Court's view that the FBI Inspection Division, Internal Investigation Unit, should investigate the
conduct of the FBI agents in this case, and in particular whether agents who conducted searches
on the BIDMAS system understood that these searches exceeded those authorized by the
warrants.

In its most recent filing, the Government provided to the Court a copy of a December 18,
2020 letter it submitted in *United States v. Jain*, No. 19-cr-59 (PKC), addressing its efforts to
remediate breakdowns in communication between FBI case agents and AUSAs that led to
breaches of disclosure obligations.  Dkt. No. 396.  In that letter, the Government explained that it

had made a number of policy changes, including requiring AUSA review of agency case files and implementing additional training programs for AUSAs and FBI agents. *Id.* at 2. These measures appear to be good and necessary first steps. However, they do not fully assuage the Court's concern that, in light of the facts in this case, queries of information in the BIDMAS system may represent a blind spot in the Government's attention to its Fourth Amendment and *Brady* obligations. Thus, the Court will require the Government to submit a further status report in six months. Its status report should discuss any training initiatives or policy changes undertaken to prevent improper use of information loaded into the BIDMAS system. It should also detail the Government's efforts to identify any other cases in which similar abuse occurred and to inform the courts and defendants in those cases.

## III. PUBLIC ACCESS TO THE PROSECUTOR DECLARATIONS

Lastly, the Court addresses the requests of the prosecutors to seal the filings that form the basis for this Opinion. Both the Constitution and longstanding common-law traditions recognize a right of public access to judicial proceedings and judicial documents. The Supreme Court has traced the tradition of open criminal proceedings to England in the days before the Norman Conquest. *See Press–Enterprise Co. v. Superior Court (Press–Enterprise I)*, 464 U.S. 501, 505 (1984). "The common law right of public access to judicial documents is firmly rooted in our nation's history." *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006). The First and Sixth Amendments also protect the right to open proceedings—the Sixth for the accused, and the First for the public and members of the press. *Press–Enterprise Co. v. Superior Court (Press–Enterprise II)*, 478 U.S. 1, 7 (1986). The First Amendment's presumptive right of access yields only where "specific, on the record findings . . . demonstrate[e] that closure is

essential to preserve higher values and is narrowly tailored to serve that interest." *United States v. Aref*, 533 F.3d 72, 82 (2d Cir. 2008) (quoting *Press–Enterprise II*, 478 U.S. at 13–14).

For the right of public access under both the common law and the First Amendment, the Court begins with whether the document sought is a "judicial document." *Lugosch*, 435 F.3d at 119; *see also Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132, 139 (2d Cir. 2016). "A 'judicial document' or 'judicial record' is a filed item that is 'relevant to the performance of the judicial function and useful in the judicial process.'" *Bernstein*, 814 F.3d at 139 (quoting *Lugosch*, 435 F.3d at 119). The Court must consider the "relevance of the document's specific contents to the nature of the proceeding and the degree to which access to the document would materially assist the public in understanding the issues before the court, and in evaluating the fairness and integrity of the court's proceedings." *Id.* (cleaned up) (quoting *Newsday LLC v. Cty. of Nassau*, 730 F.3d 156, 166–67 (2d Cir. 2013)).

"A court performs the judicial function not only when it rules on motions currently before it, but also when properly exercising its inherent supervisory powers." *Brown v. Maxwell*, 929 F.3d 41, 49 (2d Cir. 2019) (cleaned up). Judicial documents thus include filings that a district court relies on in the exercise of its supervisory powers. *Id.* Both parties agree here that the Court has inherent supervisory power to investigate misrepresentations to the Court and sanction attorney misconduct. *Nejad*, 2020 WL 5549931, at *14; *cf. United States v. HSBC Bank USA, N.A.*, 863 F.3d 125, 137 (2d Cir. 2017) ("if misconduct . . . came to a district court's attention . . . , the district court might very well be justified in invoking its supervisory power *sua sponte*"). The Court ordered filing of the prosecutor declarations and party letters to aid it in its exercise of this supervisory power, and it has relied on those documents in declining to impose

further sanctions. The documents are thus "relevant to the performance of the judicial function." *Brown*, 929 F.3d at 49 (quoting *United States v. Amodeo (Amodeo I)*, 44 F.3d 141, 145 (2d Cir. 1995)).

The prosecutor declarations, exhibits, and party letters are important to the public's understanding of the issues before the Court in this case, including both the dismissal of the underlying charges against Mr. Sadr and the Government's misrepresentation to the Court regarding the disclosure of exculpatory evidence. The Court disagrees with the prosecutors' position that the documents are exempt from disclosure because the Court's present inquiry is analogous to a disciplinary proceeding. This is not a disciplinary proceeding. The Court is exercising its supervisory authority over a criminal trial of significant public interest. The public right of access to judicial documents does not evaporate when attorney misconduct is involved. To the contrary, it is in these circumstances that it is most important "to have a measure of accountability and for the public to have confidence in the administration of justice." *Lugosch*, 435 F.3d at 119 (quoting *United States v. Amodeo (Amodeo II)*, 71 F.3d 1044, 1048 (2d Cir. 1995)). The Court thus concludes that the prosecutor declarations and party letters are judicial documents.

"A finding that a document is a judicial document triggers a presumption of public access, and requires a court to make specific, rigorous findings before sealing the document or otherwise denying public access." *Bernstein*, 814 F.3d at 141 (cleaned up). The analyses under the First Amendment and common-law right of public access differ.

The Second Circuit has outlined two tests for whether the First Amendment requires public access to particular judicial documents. Under the first test, the court considers "whether

the documents have historically been open to the press and general public and whether public access plays a significant positive role in the functioning of the particular process in question." *Id.* (quoting *Lugosch*, 435 F.3d at 120). "The second approach considers the extent to which the judicial documents are derived from or are a necessary corollary of the capacity to attend the relevant proceedings." *Id.* Once the court determines that the First Amendment applies, the bar for sealing is high: the court may deny public access only if "closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Aref*, 533 F.3d at 82 (quoting *Press–Enterprise II*, 478 U.S. at 13–14).

The weight of the common-law presumption of access depends on "the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts." *Lugosch*, 435 F.3d at 119 (quoting *Amodeo II*, 71 F.3d at 1049). Documents a court relies on in an adjudication enjoy a strong presumption in favor of access; those a court reviews but discounts a weak presumption; and those passed between the parties and not filed with the court fall outside the presumption altogether. *Brown*, 929 F.3d at 49–50. The court then balances this presumption against any countervailing interests such as the impairment of law enforcement investigations and the privacy of third parties. *Lugosch*, 435 F.3d at 120.

The Court concludes that both the First Amendment and the common law support public access to the documents in this case. Declarations on which a court relies in reaching a judicial decision are documents historically open to the press and public, and the public has a deep interest in the conduct of federal prosecutors. Information on prosecutorial misconduct— particularly where that misconduct results in vacatur of a jury verdict and dismissal of an

indictment—is of high value to those monitoring the federal courts. That the Court has determined not to impose further sanctions based on these papers alone, without a public hearing, weighs further in favor of disclosure. *See Lugosch*, 435 F.3d at 124.

Against this strong presumption of access, the prosecutors do not identify significant countervailing interests. They assert no privilege. To the contrary, the only countervailing interest they identify is privacy. The privacy interests of "innocent third parties" are not at issue here. *Amodeo II*, 71 F.3d at 1050. The prosecutor declarations and their exhibits reference only a handful of emails with third parties, none of which include private or embarrassing information. Nor do the privacy interests of the prosecutors themselves justify withholding public access to the documents. "In determining the weight to be accorded an assertion of a right of privacy, courts should first consider the degree to which the subject matter is traditionally considered private rather than public." *Amodeo II*, 71 F.3d at 1051. Though some of the communications among the prosecutors referenced in the declarations and exhibits are quite candid, all relate solely to the performance of their official duties. These documents appear to contain very limited potentially sensitive personal information, which can be handled through minimal redaction. The prosecutors have only a minimal privacy interest in the details of their handling of this case, including their communications about GX 411 and their subsequent efforts to downplay their failure to disclose it to the defense. The public's interest in precisely these details weighs against sealing.

The Court has also considered whether it is appropriate to reveal the identities of the specific prosecutors involved and concludes that such information is already readily ascertainable from publicly filed documents and transcripts from trial. *See Cunningham v.*

*Cornell Univ.*, No. 16-cv-6525 (PKC), 2019 WL 10892081, at *3 (S.D.N.Y. Sept. 27, 2019).

Addressing a similar pattern of *Brady* violations in a recent case, another court in this district has

allowed the names of prosecutors and their declarations to appear in filings on the public docket.

*See United States v. Jain*, No. 19-cr-59 (PKC), 2020 WL 6047812 (S.D.N.Y. Oct. 13, 2020).

The Court is not aware of any controlling authority holding that the privacy interests of

prosecutors outweigh the public's right of access to judicial documents concerning prosecutorial

misconduct.

In short, the public has a right to know how we got here. The facts of this case are

extraordinary. The Government sought and obtained vacatur of a jury verdict in its favor after

the expenditure of considerable public resources. The reasons it did so bear on the accountability

of public officials and on public confidence in the administration of justice. With the exception

of a narrow class of materials dealing with confidential information, the Court thus will not

maintain under seal the prosecutor declarations, party letters, and supporting documents in this

case. The Court hopes that as the Southern District of New York puts this unfortunate chapter

behind it, these documents will provide other prosecutors and members of the public some

insight into how the Government came to so badly mishandle its ethical obligations in this case,

some deterrence for misconduct in future prosecutions, and some assurance that the judiciary

treats these matters with the utmost seriousness.

## IV.    CONCLUSION

Although the Government's errors and ethical lapses in this case are pervasive, the Court

does not find that prosecutors intentionally withheld documents from the defense or intentionally

misled the Court. The Court concludes that it has reached the limit of its appropriate

involvement with the ethical issues in this case.  The Office of Professional Responsibility must investigate.  Beyond that, it is the Court's hope and belief that DOJ leadership has and will take steps to ensure that these mistakes are not repeated.

The Court DENIES in predominant part the applications to seal the declarations, exhibits, and letters submitted in response to the Court's September 16 Opinion.[1]  However, the Court will maintain the Government's supplemental letter dated October 30, 2020, and unredacted copies of the Unit Chiefs' applications to seal (Dkt. Nos. 383, 387) under seal, and will allow the prosecutors' the opportunity to propose limited redactions to the full set of submitted declarations and letters.

The Court thus ORDERS that within two weeks of the date of this Opinion, the prosecutors shall file their declarations and exhibits on the public docket; counsel for Mr. Sadr shall file their November 13, 2020 letter on the public docket; and the Government shall file its November 20, 2020 letter on the public docket.  Proposed redactions to this Opinion must be submitted on or before February 19, 2021.  Proposed redactions to the other filings must be submitted on or before February 24, 2021.  Any proposed redactions shall be consistent with the principles set forth in Section III and shall be justified by reference to the Second Circuit's decision in *Lugosch*, 435 F.3d 110.

The Court FURTHER ORDERS that within six months of the date of this Opinion, the Government shall file a status report concerning the FBI's use of raw search-warrant returns as discussed in Section II.

This Opinion shall be filed under temporary seal pending the Court's disposition of any

---

[1] The motions of The Associated Press and Inner City Press to intervene for the limited purpose of opposing the requests to seal (Dkt. Nos. 388, 393) are GRANTED.  *See Aref*, 533 F.3d at 81.

proposed redactions submitted on or before February 19, 2021.

SO ORDERED.

Dated: February 17, 2021
      New York, New York

_____
ALISON J. NATHAN
United States District Judge